# NATIONAL SUPPLY CO. v. LELAND, STANFORD JUNIOR UNIVERSITY et al.

## No. 10270.

Circuit Court of Appeals, Ninth Circuit.

April 1, 1943.

Rehearing Denied May 22, 1943.

Donald Y. Lamont, Stephen R. Duhring, and Chickering & Gregory, all of San Francisco, Cal.' (Sullivan & Cromwell, of New York City, of counsel), for appellant.

J. M. Mannon, Jr., Henry D. Costigan, and Morris M. Doyle, all of San Francisco, Cal. (McCutchen, Olney, Mannon & Greene, of San Francisco, Cal., of counsel), for appellee.

John F. Davis, Sol., Securities and Exchange Commission, Milton V. Freeman, Asst. Sol. and Louis Loss and Arnold R. Ginsburg, Attys. S. E. C., all of Philadelphia, Pa., for Securities & Exchange Commission, amicus curiae.

Before GARRECHT, HANEY, and HEALY, Circuit Judges.

HEALY, Circuit Judge.

Stanford University owned 1300 shares of 7% cumulative preferred stock of the National Supply Company of Delaware, referred to in the briefs as the "Delaware Corporation." The latter had 1248 preferred stockholders and 1890 common stockholders. In 1937 it was in arrears in the payment of dividends on its preferred stock to the extent of $35 per share. It owned practically all the common stock— 99% plus—of a Pennsylvania corporation, which in this opinion will be called "Spang." The Delaware Corporation was engaged in the manufacture and sale of machinery and supplies to the oil and gas industry and the business done by Spang was of a closely allied nature.

Under date of August 10, 1937, the Delaware Corporation mailed to .its stockholders notice ·of ·a meeting to be held October 11 following to consider the consolidation of the two companies. With the notice was enclosed a blank proxy form, a letter from the president of the Delaware Corporation and a printed copy of the consolidation agreement, the latter being entitled "Agreement and Joint Plan of Consolidation." This agreement provided that upon merger the preferred stockholders of the Delaware Corporation were to receive, for each share held, one share of preferred 5½% stock and one share of $2.00 ten-year preference stock (automatically convertible into common) of the new company, with the option in the stockholder to exchange the 5½% stock, which was convertible into common stock, for shares of prior preferred 6% series without conversion privilege. The common stockholders were to receive, for each share held, one share of the common stock of the new company. The preferred stockholders of Spang were to receive for each share one share of the 5½% series of the new company with the option to convert the same into the 6% series.

The proceeding so far as it concerned the Delaware Corporation was under a Delaware statute. This statute, pursuing a familiar pattern, provides that such a consolidation may be effected with the consent of two-thirds of the stockholders of the constituent corporations.[1] Pennsylvania has a like statute. Section 61 of the Delaware law provides that any stockholder who has objected in writing to the consolidation shall have the right, within twenty days after the effective date of the consolidation, to demand payment of the value of his stock from the corporation resulting from the consolidation. There is a provision for appraisal in the event of inability to agree on values.

At the meeting held October 11 pursuant to the notice, the agreement of consolidation was approved by the stockholders of the Delaware Corporation by the following vote: Of the 166,353 shares of 7% preferred outstanding, 116,564 shares, or 70%, were voted in favor of the consolidation and 255 shares against it. The common stock voted 66.5% in favor of consolidation with only a few hundred shares opposed. Thirty-one of the preferred stockholders, owning an aggregate of 2355 shares, duly objected to the consolidation and demanded and obtained the purchase of their stock, this being paid for at an average price of $145 per share. Spang, the other corporation concerned, ratified the consolidation on October 13, 1937. Thereupon, on October 23, 1937, the consolidation was made effective and the new company, the National Supply Company— appellant. in this suit—came into existence as a Pennsylvania corporation. All stockholders were immediately notified thereof.

---

[1] Sections 59, 60, 61, General Corporation Laws of Delaware, Rev. Code 1935, §§ 2091–2093..

The board of trustees of Stanford University had an experienced paid analyst or financial adviser and an investment committee of three members, all of whom were prominent businessmen of San Francisco. The record shows that the committee, after an earlier meeting at which no quorum was present, met on September 27, 1937, and gave some consideration to the consolidation proposal. They concluded that the plan was grossly unfair to preferred stockholders and that they would not go along with it. Assuming apparently that it was a proposal which they could accept or reject as they saw fit, the committee decided to do nothing about it. The proxy was not sent in, nor was the statutory or any notice given the Delaware corporation that Stanford objected to the consolidation. There was no demand for the payment of the fair value of the Stanford stock.

Under date of November 29, 1937, the analyst wrote the new company—appellant —a letter which will be referred to hereafter. In December 1937 and March 1938 quarterly dividends were sent to Stanford on the preferred stock in the consolidated company. The checks for the dividends were cashed and the proceeds retained without comment. In the latter part of 1937 and throughout the winter and spring there occurred a sharp business recession accompanied by a decline in the market value of securities. On May 11, 1938, Stanford began this suit.

In its complaint it alleged that it had been deprived of its shares in the Delaware Corporation by the wrongful acts of the officers and directors of that company. The specific charges made were that the literature sent out had been misleading in named respects, and had been relied on by Stanford; that the plan of consolidation was unfair and constituted a constructive fraud upon Stanford; and that in the literature the Delaware Corporation had violated the Securities Act of 1933, as amended, 15 U.S.C.A. § 77a et seq. Judgment was demanded for the value of the shares with interest.

The trial below resulted in a decision in favor of the complainant. In a short opinion the belief was expressed by the court that Stanford "was deprived of the opportunity of timely exercising its legal right to demand and receive the full cash value of its stockholding," under circumstances amounting to a breach of trust on the part of the directors and officers of the Delaware Corporation. It was thought that the letter to stockholders did not amount to a full and fair disclosure in that stockholders who might wish to object were not advised of the necessity, under the law of Delaware, of making timely objection and demanding the value of their stock. Judgment was accordingly ordered for Stanford for the value of its shares as of the date of the consolidation, the value being fixed at $195,581.39. Interest on the amount at the rate of 7% per annum was awarded from October 23, 1937. The value appears to have been arrived at on the basis of what Stanford would have been entitled to receive had the Delaware Corporation called its 7% preferred stock, or gone into liquidation, namely $115 per share plus the $35 arrears in dividends.

Fifty-six separate findings were made, the bulk of which are devoted to the development of the proposition that the plan of consolidation was unfair to preferred stockholders, that it had been conceived and effected in the interest of the common stockholders of the Delaware Corporation and as a means of cancelling the arrears of dividends upon the 7% preferred stock. The letter sent out with the plan was found to have been so framed as to induce a contrary belief. However, since it was also found that Stanford "disapproved said plan and considered it grossly unfair and unjust to, them," it is obvious that that stockholder was not in these particulars misled.

In addition to the general unfairness of the plan, the grounds urged for affirmance are twofold: (1) That Stanford was led to believe that it might, if it chose, retain its 7% preferred stock notwithstanding the consolidation, and (2) that it was not advised, as it should have been, of its right by a timely objection to claim the appraised value of its shares. There are findings in support of both grounds. Both are predicated on the letter accompanying the notice of meeting, it being contended that this letter was a purported summary upon which stockholders were entitled to rely without further inquiry.

Before turning to the letter, it will be helpful to an understanding of the problem before us if we recall the terms and purpose of § 61 of the Delaware law and consider them in relation to the rights of others than a single disgruntled stockholder. The statute requires that objections be made known in writing at or prior to the

meeting and that demand for payment be made within twenty days after the effective date of consolidation. The supreme court of Delaware, in Federal United Corporation v. Havender, 11 A.2d 331, 339, has pointed out that the merger and consolidation provisions as they now appear have existed from the inception of the General Corporation Law, and that they are written into every corporate charter. In rejecting a contention made by a preferred shareholder that his right to accrued and unpaid dividends persisted despite a merger, the court there observed: "Looking to the law which is a part of the corporate charter, and, therefore, a part of the shareholder's contract, he has not been deceived nor lulled into the belief that the right to such dividends is firm and stable. On the contrary, his contract has informed him that the right is defeasible; and with that knowledge the stock was acquired."

The statutory imperatives of timely objection and demand are of the very substance of the consolidation. Stockholders are entitled to rely on the status of things as they appear on the date of the meeting and to govern themselves accordingly. They have the right to be advised of the number of shares objecting to the merger, since these objections foreshadow money demands to be made upon the new company. The extent of such foreseen demands is necessarily of influence with stockholders in appraising the wisdom of consolidation and in persuading them whether or not they should themselves object and claim the value of their holdings. The governing boards of the constituent corporations must similarly rely on the presence or absence of substantial dissent in determining whether the tentative agreement should be adhered to or abandoned.[2] More important still, perhaps, is the statutory purpose of creating a fixed condition in order that the public, in acquiring securities of the corporation growing out of the merger, may not be prejudiced by objections belatedly asserted.

■ It may be conceded that these considerations do not in all circumstances require that a dissatisfied stockholder be denied relief if he has failed seasonably to dissent; but they do emphasize the belief that he should be held to a degree of diligence in informing himself of and in asserting his rights. He may not by inaction speculate upon the outcome of the merger. He is not permitted to plead ignorance of the law of the state of incorporation if he has negligently failed to inform himself thereof. He may not unreasonably delay the bringing of suit, either for the value of his shares of for equitable relief against what he claims is an unfair merger, to the prejudice of existing shareholders or those who may become such in the interim.

This view of the law appears fully borne out by the opinion of the Delaware court in Federal United Corporation v. Havender, supra. In that suit certain stockholders by bill in equity sought to have declared void, as against themselves, a merger of the corporation with a wholly-owned subsidiary, insofar as the merger undertook to convert complainants' preferred shares into other securities without payment of accrued dividends thereon. It was contended that such a result was not authorized by § 59 of the Delaware Corporation Law in the case of a merger of the kind made. The court held to the contrary. But in the alternative it further held that even if such a result was not within the contemplation of the statute, it would be void only as against dissenting shareholders. The complainants had objected in writing to the merger, but they did not attend the meeting to reaffirm the objection. A little over two months after the meeting one of them wrote a letter to the corporation which the court described as "disingenuous." Three months after the meeting the company was informed that complainants regarded the merger as illegal, but action was not instituted until seven months after the consolidation had been effected. The suit was held barred by conduct amounting to laches, the court saying that the exchange of securities had largely been accomplished "and a considerable number of shares had been transferred among the shareholders of the company." Hence it was thought that "the essentials of full knowledge, unreasonable delay, change of position, and intervention of rights are plainly indicated."

There is a similar holding on like grounds by the court of chancery of New Jersey in Windhurst v. Central Leather Co., 101 N.J. Eq. 543, 138 A. 772, Id., 105 N.J.Eq. 621, 149 A. 36, in a suit by dissenting stock-

---

[2] The letter in this case stated that the right was reserved to the board of the Delaware Corporation to abandon the plan because of dissent.

holders to enjoin a merger.[3] The decision of the chancery court was affirmed on appeal, 107 N.J.Eq. 528, 153 A. 402.

In this frame of reference we are obliged to consider Stanford's diligence or the lack of it. Certainly there was ample time to investigate and to pursue such inquiries as might reasonably have suggested themselves to a stockholder as persuaded of the injustice of the proposal as this one was. The notice and the consolidation literature were presumably in the hands of the committee approximately sixty days in advance of the meeting, whereas the statute requires notice of but twenty days. How did the committee and its analyst employ this time and what use did they make of the literature?

We turn first to the allegedly misleading letter. It states that the consolidation proposal will be presented in accordance with the terms of the enclosed agreement and plan. The reader is referred to that document "for the full provisions of that agreement, and all references in this letter with respect to those provisions are subject to the detailed statement thereof contained in the agreement itself." The obvious purpose of the letter was to persuade the recipient of the supposed advantages of the consolidation and of its fairness to all concerned. Advantages taxwise are stressed, and the promise is held out of the prompt payment of current dividends on the preferred shares in the new company. Audited balance sheets of the two companies are attached, predicated on the expressed assumption that the consolidation will be effected without dissent; and it is stated that under the agreement "the New Company will take over all of the assets and assume all of the liabilities of both companies." The stockholder is asked to sign and return the proxy if he favors the consolidation.

There is no statement in the letter that if the proposed merger be consummated dissatisfied shareholders may never-theless retain their old stock. Intimations to this effect said by counsel to be found in its phraseology are not apparent to a reader with no thesis to sustain. The shareholder who had read the letter with a degree of intelligent care could not but be put on inquiry as to the fate of his existing holdings in the event of a merger. The share capitalization of the new company is tabulated in detail, the amount and nature of its securities being carefully stated. There can hardly be said to be a rational place in this picture for the existing securities of the constituent corporations. Had the agreement itself been examined all rational doubt on the subject would have been set at rest. On this phase of the matter we conclude that Stanford was not lulled into a sense of security. It was merely mistaken.

As already noted, the consideration which seems chiefly to have moved the trial judge was not the contention just discussed, but the failure of the letter to disclose the legal right of dissenting stockholders to be paid for their shares and the necessity on their part of making timely objection. This view of the judge is deserving of our most thoughtful attention. But under all the circumstances of the case we are not able to agree that it warranted a decision in favor of the complainant.

The full literature of the consolidation was before the shareholder. The plan, which was printed throughout in large type, contained in four places direct and unmistakable references to the legal right of withdrawal and payment. For example, Article IV states that "except as to those who shall have dissented and demanded the value of their shares, as provided by law," stockholders will promptly receive their certificates in the new corporation. The example is typical of the other references. Had the analyst or some member of the committee been at pains to read the literature the existence of the legal right

[3] In his opinion in that case (101 N.J. Eq. 549, 138 A. 775) Vice Chancellor Bentley said "No warning of this suit was given at the meeting. In the meantime, not only had the corporation changed its position, but other rights had been created without the slightest notice of this complainant's objections. A dividend had been declared, payable in a few weeks. Large numbers of stockholders in the old companies had entered into the voting trust, spoken of above. The corporation had expended large sums of money in and about the completion of the consolidation, and the certificates issued by the voting trustees had been dealt in on the stock market, and the public thus had become involved. The company had expended about $1,250,000 as a part of the consideration for the surrender of the old preferred stock, which included $5 in cash for each share so surrendered. If this be not laches, I do not understand that doctrine."

to dissent and demand payment could not well have escaped their attention.

In this respect it is important to remember that Stanford was from the beginning persuaded of the "gross" unfairness of the plan. A stockholder who is induced by the literature sent him to believe that a proposed merger is fair, though in fact it is not, is not led to inquire as to his legal rights in the premises. Ordinarily he simply goes along with the proposal without further inquiry. But not so a stockholder entertaining the views of Stanford. As a reasonable person he would want to know what provision, if any, is made by the law of the corporate domicile for taking care of the dissenter. We gather that the committee was content to forego so vital an inquiry because its members mistakenly believed that the University was entitled to keep its stock, consolidation or no consolidation. Thus an assumption indulged in without reason and without inquiry induced the complacency which characterized the conduct of this stockholder throughout.

We have heretofore mentioned the letter written the new company by Stanford's analyst in the latter part of November 1937. This letter stated that the affairs of Stanford were handled by a committee which convened infrequently; and "as a result we have been somewhat slow in writing to inquire about this plan, but our committee was anxious to obtain more information before assenting to the plan and has asked me to write to make certain inquiries." The letter suggested that Stanford would be impairing its investment position if it were to accept a ten-year preference stock in lieu of the cash dividends accrued; and information was asked as to the status of Stanford's investment "in case we do not wish to receive these new shares and continue with the shares we now own." Appellant replied promptly that Stanford's right to dissent had ceased and that it was bound by the consolidation. Why a similar letter of inquiry was not directed to the Delaware Corporation in August or September previously is a question for which Stanford has proposed no satisfactory answer.

■ It was not until five months later that this suit was commenced. Meanwhile, promptly upon the coming into existence of appellant in October 1937, its securities were listed on the New York Stock Exchange and thereafter freely dealt in. The record shows that these transactions ran as high as several hundred shares daily. Thus the public had become involved. The indicia of laches and estoppel—silence, inaction, the failure to exercise ordinary care, dilatory conduct, changes of position, and intervention of rights—are "plainly indicated."

■ It is not clear to what extent the trial court was influenced by appellee's contention that the Securities Act of 1933 had been violated. Certain of the findings seem to indicate the belief that appellee has causes of action under both § 12(1) and § 12(2) of the Act. The Securities and Exchange Commission has filed an exhaustive brief amicus curiae indicative of its view that the consolidation did not involve a "sale" of securities, or an exchange amounting to a sale, hence the civil liability provisions of the Act have no application. Without going into the matter, we may say that we are in accord with the views of the Commission.

Reversed.