William **DASHO**, Dasho-Rogers, Inc., an Illinois corporation, and Maurice H. Schy, Plaintiffs-Appellants,

v.

The **SUSQUEHANNA CORPORATION**, a Delaware corporation et al., Defendants-Appellees.

No. 15839.

United States Court of Appeals Seventh Circuit.

June 26, 1967.

Lawrence A. Jacobson, Ira S. Kolb, Adolf Loeb, Chicago, Ill., for appellants.

Paul N. Rowe, John B. King, Theodore R. Boehm, Indianapolis, Ind., Baker & Daniels, Indianapolis, Ind., of counsel, for Indiana Farm Bureau, et al., amici curiae.

Philip A. Loomis, Jr., General Counsel, Walter P. North, Associate General Counsel, Jacob H. Stillman, Martin D. Newman, Attys., Securities and Exchange Commission, Washington, D. C., amicus curiae.

Harry T. Ice, R. Stanley Lawton, Donald F. Elliott, Jr., Indianapolis, Ind., Ice, Miller, Donadio & Ryan, Indianapolis, Ind., of counsel, for Hansford C. Mann and Edith G. Mann, amicus curiae.

Samuel Weisbard, Stephen C. Sandels, Chicago, Ill., McDermott, Will & Emery, Chicago, Ill., of counsel, for defendant-appellee, Howard J. Lauhoff.

Melvan M. Jacobs, Robert O. Mansell, Charles D. Leist, Alfred P. Bianucci, Chicago, Ill., Milton H. Gray, Lionel G. Gross, Louis E. Rosen, Chicago, Ill., for all defendants-appellees other than Howard J. Lauhoff.

Harold C. Stuart, Dickson M. Saunders, Tulsa, Okl., for defendants-appellees Ralph A. L. Bogan, Jr., Edward O. Boshell, M. M. Hardin, A. D. Martin, Harold G. Mason, J. Earle May, Hugh C. Michels, Aksel Nielsen, D. W. Reeves, R. C. Schenk, Harold C. Stuart, Albert W. Thomson and Francis C. Woolard.

Joseph A. Sommer, Santa Fe, N. M., for American Gypsum Co.

Before SCHNACKENBERG, FAIRCHILD and CUMMINGS, Circuit Judges.

SCHNACKENBERG, Circuit Judge.

William Dasho, Dasho-Rogers, Inc., an Illinois corporation, and Maurice H. Schy, plaintiffs, have appealed from an order

of the district court entered June 30, 1966, dismissing a derivative action brought by plaintiffs, as shareholders of The Susquehanna Corporation, against (*inter alia*) its officers and directors, charging a conspiracy to defraud Susquehanna in the sale and purchase of securities in violation of § 17(a) of the Securities Act of 1933, 15 U.S.C.A. § 77q, § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C.A. § 78j, and of rule 10b-5 of the Rules of Securities and Exchange Commission ("SEC").

On December 21, 1965, plaintiffs had filed a third amendment to the complaint adding count II, in which they alleged *inter alia* that defendants caused Susquehanna to distribute a false proxy statement on or about November 12, 1965, violative of § 14(a) of the 1934 Act, which led to stockholder approval of Susquehanna's merger with defendant American Gypsum Company, a New Mexico corporation.

Although not so designated on its face, the complaint filed October 22, 1965 was referred to by the district court and by the parties as count I, and is so referred to in this opinion.

Defendants moved to dismiss both counts. Although there was no ruling as to count II, which is not a part of this appeal, the district court sustained defendants' motions to dismiss count I, and, in so doing, made reference to a proxy statement attached as an exhibit to count II.

From the sworn complaint, as amended, these facts appear: Susquehanna on June 30, 1965 had outstanding 2,763,035 shares of stock, traded in the over-the-counter market. It had about 8,755 shareholders. Its principal assets were cash, short-term investments, and the ownership of subsidiary companies engaged in activities such as mining and processing of ores, operation of a bus line, production of sulphuric acid, vanadium pentoxide and an aggregate used in the manufacture of concrete. Its current assets at the end of its fiscal year on June 30, 1965, amounted to $13,730,081, which was about 15 times its current liabilities of $917,331. It also had an income tax carry forward credit of about $12,000,-000, acquired in connection with the liquidation of a railroad.

During the year before April 19, 1965, Susquehanna was managed by defendants George M. Bard, Ralph A. L. Bogan, Jr., Edward O. Boshell, J. Patrick Lannan, Howard J. Lauhoff, Harold G. Mason, J. Earle May, Hugh C. Michels, R. C. Schenk, Franklin B. Schmick, Harold C. Stuart, Arthur M. Wirtz, and Francis C. Woolard, here referred to as "the Lannan group", who individually owned or controlled 436,297 shares on that date. They were directors or officers, the dominant shareholders being Lannan, chairman of the board, and Schenk, president and director.

(a) It further appears from said complaint, upon information and belief, that the Lannan group, in complete disregard and in derogation of their duty to Susquehanna and to its other shareholders, and intending unjustly to enrich themselves at the expense and to the damage of Susquehanna and its other shareholders, agreed and conspired among themselves, and with defendant Herbert F. Korholz, acting for himself and Gypsum, to cheat and defraud Susquehanna and said other shareholders out of property and property rights having great value. This was to be done by causing Susquehanna to acquire by indirection 435,000 shares of its own stock, all or a substantial part of which were owned or controlled by the Lannan group, at a price about $1,740,000 in excess of the fair market value of such shares. This result was to be accomplished through the device of a sale of the shares by the group to Gypsum, acting through Korholz, its president and majority stockholder, followed by a merger into Susquehanna. An inducement to Korholz was the transfer of control of Susquehanna, by seriatim resignations of Lannan group directors, and the substitution of Korholz and his nominees. Success of this plan depended upon the re-election of the group as Susquehanna directors at the annual stockholders' meeting on April 19,

1965. To carry out this plan, the group solicited proxies pledging its own re-election to the Susquehanna board. These solicitations contained misrepresentations of fact, in furtherance of the conspiracy, pleaded with particularity in the complaint.[1] With the proxies so obtained, the group elected to the board thirteen of its members. Of the defendants here who were Susquehanna directors, all were present at that meeting, but none did anything to inform the shareholders of the real plan of the Lannan group to merge with Gypsum. A dissident group of shareholders (the "Kansas City Group"), representing about 328,000 shares, cumulated their votes and placed defendants A. D. Martin and Albert W. Thomson on the board.

On May 19, 1965, defendants Lannan and Korholz issued a press release stating that Lannan and "major Susquehanna shareholders" had sold 435,000 shares of Susquehanna which they owned or controlled to Korholz acting on behalf of Gypsum, for $6,525,000 in cash.

The vacancies on the Susquehanna board were filled by electing Korholz as chairman and defendants Hardin, Nielsen and Reeves, as members thereof, they being the nominees of Korholz.

The foregoing transfer of control of the Susquehanna board was averred in count I to be in furtherance of the conspiracy.

(b) Count I alleges that, in furtherance of the conspiracy, in May 1965 the Kansas City group threatened to sue, charging corporate mismanagement, and defendants caused Susquehanna to exchange 140,000 shares of Vanadium Corporation stock owned by Susquehanna for 222,107 shares of Susquehanna owned by the Kansas City group, plus $300,685 in cash. This exchange was on a basis which undervalued the Vanadium stock by $700,000, the profit realized by the Kansas City group two weeks later on a resale of that stock to the Vanadium Corporation.

Korholz owned or controlled 56% of the outstanding voting stock of Gypsum. He secured the passage of resolutions by the directors of the two corporations, recommending merger of Gypsum into Susquehanna, on the ratio of 1.9 shares of Gypsum for 1 share of Susquehanna, a ratio averred in count I to represent a gross overvaluation of the Gypsum stock. Although included in the assets of Gypsum were the 435,000 Susquehanna shares purchased from the Lannan group, Gypsum purchased these shares with funds borrowed from a bank, which loan was in effect assumed by Susquehanna under the merger agreement. Thus, if the merger were consummated, Susquehanna would have acquired 435,000 shares of its own stock at a price of about $1,740,000 in excess of the fair market value thereof.

Plaintiffs in count I sought, *inter alia,* to enjoin the Gypsum-Susquehanna merger, to recover for Susquehanna the $1,740,000 premium realized by the Lannan group on the sale of the 435,000 shares of Susquehanna, and to surcharge defendants with $700,000, the amount by which they undervalued Susquehanna's holding of Vanadium shares, in the exchange of such shares owned by the Kansas City group.

While defendants moved to dismiss count I on the ground that plaintiffs

---

1. At the stockholders' meeting on April 19, 1965, where Lannan and Schenk presided, Lannan represented to the stockholders present:

"* * * that a merger of Susquehanna with one of several companies listed on the New York Stock Exchange was imminent; that such merger would be beneficial to Susquehanna and its shareholders; that such pending merger negotiations would be hampered and have little chance to materialize unless the Lannan group of defendants and the two additional candidates nominated by management were elected as directors of the corporation. Defendant Lannan further represented to the stockholders present at the meeting that he would not sell his Susquehanna shares for $15 per share, a price then approximately 20% above market, notwithstanding that he had already agreed to sell [those] shares to defendant Korholz at $15 per share. * * *"

were not purchasers or sellers of securities, plaintiffs point out that they sued derivatively, asserting a cause of action belonging to Susquehanna, the corporation injured by the wrongful acts of its officers and directors, which is the real party-plaintiff.

Plaintiffs contend that, under the facts alleged by them and the decided cases, the "issuance" by a corporation of shares to be exchanged for shares or assets of of another corporation constitutes the issuing corporation either a seller or a purchaser of securities entitled to the protection of the securities laws. In addition, it appears from a brief which we permitted to be filed by the Securities and Exchange Commission as amicus curiae, that the question presented here is not whether a purchase or a sale was made by an individual Gypsum or Susquehanna shareholder, but that the issue is whether there was a purchase or a sale by Susquehanna itself. We are impressed by the argument of the Commission that the proposed merger of Gypsum into Susquehanna involved both a purchase (the acquisition by Susquehanna of 435,000 shares of its own stock) and a sale (the issuance of Susquehanna shares to Gypsum's shareholders) by Susquehanna.

■ Our attention is called to Sections 3(a) (13) and 3(a) (14) of the Exchange Act, 15 U.S.C. § 78c (a) (13) and § 78c (a) (14), which define the word "purchase" to "include any contract to buy, purchase, or otherwise acquire," and "sale" to "include any contract to sell or otherwise dispose of." This broad language indicates an intention by Congress that the words "purchase" and "sale" are not limited to transactions ordinarily governed by the commercial law of sales. The purpose is evidently to make control of securities transactions reasonably complete and effective to accomplish the purposes of the legislation.

In Ruckle v. Roto American Corporation, 2 Cir., 339 F.2d 24 (1964), the court said, at 27:

"As a matter of authority and principle, the issuance by a corporation of

its own shares is a 'sale' to which the anti-fraud policy expressed in the federal securities laws extends. Hooper v. Mountain States Securities Corp., 5 Cir., 1960, 282 F.2d 195, 200–203, cert. denied, 1961, 365 U.S. 814, 81 S.Ct. 695, 5 L.Ed.2d 693; * * *."

■ We are of the opinion that an acquisition or disposition of securities in exchange for other securities falls within the statutory definitions and that this reasoning applies to a case of merger. There are no circumstances indicating a contrary congressional intent, but the legislative history and the purpose of the securities laws indicate that an exchange of securities incidental to a merger is subject to their antifraud protections.

Inasmuch as the Exchange Act was meant to enlarge the protection for investors afforded by an earlier act (1933), it seems reasonable to say that Congress intended such reorganizations as that here involved to come within its antifraud provisions.

We reach the conclusion that the Supreme Court never intended to give to the word "sale" the limited common-law meaning of that word, when applied to stock transactions such as those which we consider in the case at bar. As that court said in Wilko v. Swan, 346 U.S. 427, at 430–431, 74 S.Ct. 182 at 184, 98 L.Ed. 168 (1953):

"In response to a Presidential message urging that there be added to the ancient rule of *caveat emptor* the further doctrine of 'let the seller also beware,' Congress passed the Securities Act of 1933. Designed to protect investors, the Act requires issuers, underwriters, and dealers to make full and fair disclosure of the character of securities sold in interstate and foreign commerce and to prevent fraud in their sale. To effectuate this policy, § 12(2) created a special right to recover for misrepresentation which differs substantially from the common-law action in that the seller is made to assume the burden of proving lack of scienter. * * *"

The Supreme Court in Securities & Exchange Commission v. W. J. Howey Co., 328 U.S. 293, 299, 66 S.Ct. 1100, 110 1103, 90 L.Ed. 1244 (1946), recognized that, for the purpose of the Securities Act, the term "investment contract" would be interpreted according to

" * * * a flexible rather than a static principle, one that is capable of adaptation to meet the countless and variable schemes devised by those who seek the use of the money of others on the promise of profits."

Thus in the case at bar, when the merger was approved and the exchange of securities occurred, the owner of stock had in effect purchased a new security and paid for it by turning in his old one. In such a situation the antifraud protections afforded by the Securities Act are needed no less than in a situation where one makes an outright purchase of stock for cash. We agree with counsel for the amicus curiae that the complex nature of a merger enhances the opportunities for fraud and thus increases the need for antifraud protection.

We are compelled to the conclusion that the district court was unduly impressed by the semantic and conceptual difficulties arising when the words "purchase" and "sale" are applied to mergers.

██ We conclude and hold that, for the purpose of this case, there is no inherent distinction under the Securities and Exchange acts between a corporate sale of stock for cash and the relative impact on the corporate shares of two corporations resulting from their merger.

██ In view of this result, it is not necessary for us to consider other points raised by plaintiffs.[2]

Wherefore, the order from which this appeal was taken is reversed and this cause is remanded to the district court for further proceedings.

Reversed and remanded.

FAIRCHILD, Circuit Judge (with whom CUMMINGS, Circuit Judge, joins), concurring.

Two different transactions are presented as foundations for causes of action under the fraudulent interstate transactions section of the securities act[1] and the manipulative and deceptive practices section of the exchange act.[2] And we must answer two questions of law, each of considerable difficulty.

The Transactions:

I. *The transfer, by successive steps, of 435,000 shares of Susquehanna stock from the Lannan defendants to Korholz and Gypsum, and ultimately into the assets of post-merger Susquehanna, via the merger of Gypsum into Susquehanna.* It is claimed that this was a fraudulent scheme by which the Lannan defendants could extract a highly excessive price from Susquehanna for their shares.

II. *The sale by Susquehanna of 140,-000 shares of Vanadium stock to the Kansas City group in return for 222,107 shares of Susquehanna stock, plus boot money.* It is claimed that this sale produced a large profit for the Kansas City group and was a scheme devised by defendants in order to silence the Kansas City group and protect the carrying out of Transaction I for the benefit of defendants.

The Questions:

A. *Does a statutory merger involve a sale of securities so that a cause of action in favor of Susquehanna can be predicated upon the alleged fraudulent scheme involved in Transaction I?* It is not claimed that Gypsum had a cause of action which became the property of

2. Lauhoff's contention that count I is insufficient to state a claim for relief against "him in particular" is without merit herein. Lauhoff's sale of his stock and his resignation as a director were allegedly two of the overt acts done by him in furtherance of the conspiracy. Thus, having allegedly joined the conspiracy and taken steps to assure its success, Lauhoff is responsible for the acts of his co-conspirators in furtherance of said conspiracy.

1. 15 U.S.C. § 77q.

2. 15 U.S.C. § 78j.

Susquehanna upon merger, presumably because the Lannan group did not owe Gypsum the special duty as directors which they owed Susquehanna.

B. *When the directors of a corporation cause it to buy securities at an excessive price or to sell securities at an inadequate price, in order to serve some personal interest of the directors, adverse to the corporation, may a cause of action under the securities and exchange acts arise in favor of the corporation by reason of the failure of the directors to fulfill the special obligations they owe the corporation as directors?* Causes of action may well arise under state law under these circumstances, but, assuming other grounds required for federal jurisdiction, do activities of corporate directors for their personal advantage at the expense of the corporation amount to fraud under the securities and exchange acts?

A. *Does a statutory merger involve a sale of securities?* This question has usually been considered in terms of whether, upon merger, there is a sale of shares in the post-merger surviving corporation to the shareholders of the merging corporations in exchange for their pre-merger shares in each corporation. If such sale occurs, within the meaning of the securities and the exchange acts, fraud in persuading the shareholders to approve merger would give rise to a federal cause of action in favor of the shareholders. Here, however, one of the merging corporations, which is also the surviving corporation, is asserting a cause of action grounded on the fact that the merger, by design of the defendants, has forced it to assume the obligation for the excessive price at which the other merging corporation purchased an asset. (Or perhaps the merger could be analyzed as a purchase by Susquehanna of Gypsum's assets including the 435,000 shares, accepted at a figure in excess of their value, in return for issuance of Susquehanna shares to Gypsum shareholders.)

Neat corporate theory would dictate that a statutory merger involves no sale of the shares or assets of merging corporations, but in the light of the purpose of the securities and exchange acts to protect the investing public, it seems reasonable that the concept of sale in these acts may encompass the various modifications in rights which are produced by merger.

Legislative history, administrative contruction, and judicial decision do not produce a clear and consistent answer.[3]

Professor Loss finds, in a 1933 committee report, an indication that a merger was regarded as a sale for which 15 U.S.C. § 77e would require a registration statement,[4] and the Federal Trade Commission, which at first administered the securities act, required a registration statement before a proposal for merger was submitted to shareholders.

Starting in 1934, however, the Securities and Exchange Commission indicated that a merger was not a sale such that a registration statement is required.[5] This remains the position of the commission, although in 1956, the commission considered repeal of its Rule 133, stating that its construction had "become an instrument of evasion of the law."[6] Prior to 1951 the commission took the even broader position that a merger was not a sale, apparently for any purpose.[7] In 1951, the commission adopted Rule 133, making it clear that its position that

3. See, generally, Loss, Securities Regulation (1961 ed.) 518–539.

4. Loss, op. cit. 519, H.R.Rep. No. 85, 73d Cong. 1st Sess. (1933) 16.

5. Loss, supra footnote 3, p. 520; Note to Rule 5 of Form E–1, adopted 1935; Rule 133, adopted 1951.

6. Loss, supra footnote 3, p. 529, n. 232.

7. In National Supply Co. v. Leland Stanford, Jr. University (9th Cir. 1943), 134 F.2d 689, 694, cert. den. 320 U.S. 773, 64 S.Ct. 77, 88 L.Ed. 462, the court noted that the commission had filed an amicus brief "indicative of its view that the consolidation did not involve a 'sale' of securities, or an exchange amounting to a sale, hence the civil liability provisions of the Act have no application."

a statutory merger involves no sale applies only to the registration requirements of the act. In the case at bar, the commission takes the position that an exchange of shares pursuant to a merger is a sale so that the antifraud sections of the acts apply.

Judicial decisions have not been entirely consistent in this field.

In 1943, the ninth circuit indicated the view that a consolidation did not involve a sale of securities or an exchange amounting to a sale [8] although this was not the principal ground for the decision.

In 1960, a district court held that a merger "may or may not involve a purchase and sale within the meaning of Section 10(b)" of the exchange act, and that the transaction before the court appeared to be a purchase and sale. The type of merger does not appear in the opinion. It was said that "Plaintiff is a corporation which issued its stock in exchange for the stock of another corporation."[9]

In 1963, this circuit considered an attack on a merger where a violation of sec. 10(b) of the exchange act had been alleged, among other things, but the opinion sets forth no distinct holding that a statutory merger is not a sale under the securities and exchange acts.[10]

In 1966, a district court appears to have held that a merger was a sale so that shareholders had a cause of action on account of misleading reports which persuaded them to vote for the merger.[11]

And in 1967, the second circuit held that a shareholder who was given the right, in a short form merger, to turn in his shares for cash, and who had the statutory alternative of seeking an appraisal, was a seller who might have a cause of action for deceptive practices under the exchange act.[12] A district court reached the same conclusion in 1965.[13]

The argument that the transformation of rights occurring upon statutory merger is a distinct corporate phenomenon which does not involve purchase and sale of securities has some appeal, but in view of the objectives of the securities and the exchange acts, it seems to me better to recognize, for the purpose of the antifraud provisions, that sales and purchases are involved. This view does no violence to the statutory language, and is the present interpretation of the body which is responsible for the administration of the acts.

B. *Misuse of directors' power as fraud.* Deception by defendants is more readily spelled out in Transaction I. The allegations suggest that the sale of 435,000 shares owned by the directors to the corporation at an excessive price was somewhat concealed by a scheme, composed of the successive transfers and the ultimate merger. There may be both palpable deception and failure to disclose defendants' adverse personal interest. With respect to Transaction II, there is only the latter.

In Birnbaum v. Newport Steel Corp.[14] the second circuit held that where a corporate insider sold his stock to a third party, and misrepresented the facts to the other shareholders, this gave rise

---

8. National Supply Co. v. Leland Stanford Jr. University, supra footnote 7. See Sawyer v. Pioneer Mill Company (9th Cir. 1962), 300 F.2d 200, where the question would have arisen again, but for mootness.

9. H. L. Green Company v. Childree (S.D. N.Y.1960), 185 F.Supp. 95, 96.

10. Borak v. J. I. Case Company (7th Cir. 1963), 317 F.2d 838, 847, aff'd, 377 U.S. 426, 84 S.Ct. 1555, 12 L.Ed.2d 423 (1964).

11. Simon v. New Haven Board & Carton Company (D.Conn.1966), 250 F.Supp. 297, involving a long form merger such as in this case.

12. Vine v. Beneficial Finance Company (2d Cir. 1967), 374 F.2d 627, 635.

13. Voege v. American Sumatra Tobacco Corporation (D.Delaware 1965), 241 F. Supp. 369, 373.

14. (2d Cir. 1952), 193 F.2d 461, 462–463, cert. den. 343 U.S. 956, 72 S.Ct. 1051, 96 L.Ed. 1356 (1952).

to no cause of action under the exchange act in favor of the shareholders. "The district court, however, viewed the Rule in question as aimed only at 'a fraud perpetrated upon the purchaser or seller' of securities and as having no relation to breaches of fiduciary duty by corporate insiders resulting in fraud upon those who were not purchasers or sellers." The court of appeals agreed. The case can be distinguished on its facts from the present one because the corporation is here suing as a defrauded seller and buyer of securities. The second circuit has recently noted the commission's view that the *Birnbaum* rule is too narrow.[15]

 In Ruckle v. Roto American Corporation,[16] the second circuit held "that federal courts have jurisdiction over actions in which the complaint alleges that a corporation has been or may be defrauded into issuing or selling securities through the failure or refusal of some of its directors fully to disclose to the remaining directors material facts concerning the transactions or the financial condition of the corporation." The same holding would follow (under the exchange act) where a corporation, as here, has purchased securities.

In O'Neill v. Maytag,[17] the second circuit concluded that where all the directors participated in causing the corporation to exchange stock at a disadvantage to it and personal advantage to them, there could be no claim of deceit, withheld information, or misstatement of material fact. The only possible material difference I can perceive between *Ruckle* and *O'Neill* is that in *Ruckle* there were directors who were not participants in the transaction and thus could be deceived in the ordinary sense. In either case, however, the failure of the defendant directors to perform their duty presumably injured the corporation, and I do not believe it is sound to differentiate between situations where the directors were unanimous in wrongdoing and those where less than all were involved.

I conclude that Susquehanna has a cause of action both with respect to the allegedly improvident acquisition, by merger, of 435,000 Susquehanna shares and the allegedly improvident exchange of Vanadium shares for Susquehanna shares.

15. A. T. Brod & Co. v. Perlow (2d Cir. 1967), 375 F.2d 393, 397, footnote 3.

