RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206
File Name: 07a0304p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

JOHN MURPHY; JAMES SMITH,

*Plaintiffs-Appellants/
Cross-Appellees,*

Nos. 06-3980/4034

*v.*

STARGATE DEFENSE SYSTEMS CORP.; JAMES L.
WOODRUFF; DANIEL P. ROSS; SPECTRUM INFRARED,
INC.,

*Defendants-Appellees/
Cross-Appellants.*

Appeal from the United States District Court
for the Northern District of Ohio at Cleveland.
No. 05-02121—Donald C. Nugent, District Judge.

Argued: June 6, 2007

Decided and Filed: August 10, 2007

Before: NORRIS, GILMAN, and SUTTON, Circuit Judges.

_____

**COUNSEL**

**ARGUED:** Kenneth L. Gibson, GIBSON & LOWRY, Cuyahoga Falls, Ohio, for Appellants.
Richard N. Selby II, DWORKEN & BERNSTEIN CO., Painesville, Ohio, for Appellees.
**ON BRIEF:** Kenneth L. Gibson, GIBSON & LOWRY, Cuyahoga Falls, Ohio, for Appellants.
Richard N. Selby II, DWORKEN & BERNSTEIN CO., Painesville, Ohio, for Appellees.

_____

**OPINION**

_____

ALAN E. NORRIS, Circuit Judge. This appeal arises out of the sale of Spectrum Infrared,
Inc. ("Spectrum"), an Ohio corporation owned by plaintiffs John Murphy and James Smith. In 2005,
Spectrum was sold to Stargate Defense Systems Corp. ("Stargate"), a business operated by
defendants James Woodruff and Daniel Ross. The sale was structured as a stock exchange: plaintiffs
traded their stock in Spectrum for stock in Stargate. It turned out, however, that the Stargate stock
was worthless. Consequently, plaintiffs filed suit seeking to rescind the sale. At the same time, they
sought to rescind two stock purchases made in 2002 that involved defendant Woodruff. Although

the amended complaint invokes both federal and state-law causes of action, the only issue on appeal concerns the scope of Ohio's Securities Act ("Blue Sky Law"), Ohio Rev. Code § 1707.01 et seq.

Following a bench trial, the district court granted plaintiffs the right to rescind the 2002 stock purchases pursuant to Ohio's Blue Sky Law, but it denied relief on all other grounds. Plaintiffs appeal the district court's ruling only so far as it denied them rescission of the 2005 stock exchange. Defendants cross appeal, arguing that plaintiffs should not have been able to rescind the 2002 stock purchases. For the reasons that follow, the district court's decision permitting plaintiffs to rescind the 2002 stock purchases is affirmed. However, because we disagree with the district court's conclusion that plaintiffs were not stock purchasers protected by Ohio's Blue Sky Law we reverse that portion of its decision.

## I.

In 2001, plaintiffs placed advertisements in a Cleveland business journal offering to sell Spectrum. In response, Woodruff contacted plaintiffs, representing that Q Corp., a corporation with which he was involved, would be going public and that he was interested in acquiring Spectrum. According to him, Q Corp. derived the bulk of its business from government contracts and Spectrum's products could be used in a joint venture with Q Corp. Throughout December 2001 and January 2002, Woodruff made a number of statements regarding Q Corp.'s sales volume and interest in acquiring other companies. In late January 2002, Woodruff suggested that Q Corp. buy Spectrum by means of a stock exchange. He urged Murphy to make an investment in Q Corp. as part of the deal.

On January 24, 2002, plaintiffs and their accountant met with Woodruff at Q Corp.'s offices. They were told that Q Corp. had a net worth of $3.5 million, that Q Corp. employed over 50 people, including two Ph.D.'s, that there were plans for an initial public offering in October, that its shares were selling at $15, and that a medical device it manufactured was approved for use on animals. Before learning that these statements were false, plaintiffs agreed to purchase 400 shares of Q Corp. stock for a price of $12,000. Stock certificates in the name of Q Corp. were never issued to plaintiffs. Rather, in March 2005, stock certificates in Stargate's name were issued. These certificates were worthless, however, because Stargate was not incorporated until September 2005.

Despite his earlier representation, on January 31, 2002 Woodruff told plaintiffs that Q Corp. stock had never sold for less than $30 per share and offered to provide plaintiffs with a list of shareholders who had purchased the stock at this price. In early February, he told plaintiffs that "everything was in place to close on Copper Foil," yet another company that Q Corp. was allegedly purchasing. Although the reason remains unclear, Murphy made a $20,000 five-day loan to Q Corp. at that time. When the money was not repaid, Murphy agreed to accept 1,000 shares of Q Corp. stock at a discounted price of only $20 per share. According to Woodruff, he could transfer the stock to Murphy at this low price because the spouse of a shareholder was trying to unload it. Again, stock certificates were not issued until March 2005, and were issued in Stargate's name.

In order to facilitate the sale of Spectrum, the parties worked out an agreement to trade shares of stock in March 2005. Plaintiffs were given a proposed purchase agreement, which valued Spectrum at $1,008,000 and stated that it was being sold for 33,600 shares of Stargate stock valued at $30 per share. In mid-March, the parties executed the agreement.

After learning that the Stargate stock was worthless, plaintiffs demanded rescission of the sale on August 3, 2005, and, when defendants refused, plaintiffs filed suit. During the bench trial, Murphy testified that he and Smith relied upon Woodruff's representations when they decided to purchase stock in 2002 and sell their company. The district court determined that between February

2002 and March 2005, Woodruff knowingly made a number of false representations regarding the performance and future prospects of Q Corp. and/or Stargate, including representations that it had been awarded a $1.75 million government contract and that Q Corp. was worth $3.5 million. It determined that Q Corp. was substantially leveraged based on loans made by another individual, and that its bank accounts had nominal or negative balances. Based on these misrepresentations concerning the value and performance of Q Corp., the district court held that plaintiffs had the right to rescind the January 25, 2002 and February 4, 2002 stock transactions pursuant to Ohio's Blue Sky Law. However, it concluded that plaintiffs could not rescind the sale of Spectrum because they were the sellers in that transaction, not the purchasers, and therefore could not qualify for relief under the Blue Sky Law.

## II.

*Plaintiffs as Purchasers*

Plaintiffs appeal the district court's application of Ohio's Blue Sky Law to the March 2005 exchange of stock . When a judgment is appealed following a bench trial, this court reviews the district court's findings of fact for clear error and its conclusions of law *de novo*. *Pressman v. Franklin Nat'l Bank,* 384 F.3d 182, 185 (6th Cir. 2004) (citing *Harrison v. Monumental Life Ins. Co.*, 333 F.3d 717, 721-22 (6th Cir. 2003)). "Statutory interpretation is a question of law . . . subject to *de novo* review." *In re Koenig Sporting Goods, Inc*., 203 F.3d 986, 988 (6th Cir. 2000).

Ohio's Blue Sky Law contains the following provision with respect to rescission:

(A) Subject to divisions (B) and (C) of this section, every sale or contract for sale made in violation of Chapter 1707 of the Revised Code, is voidable at the election of the purchaser. The person making such sale or contract for sale, and every person that has participated in or aided the seller in any way in making such sale or contract for sale, are jointly and severally liable to the purchaser, in an action at law in any court of competent jurisdiction, upon tender to the seller in person or in open court of the securities sold or of the contract made, for the full amount paid by the purchaser and for all taxable court costs, unless the court determines that the violation did not materially affect the protection contemplated by the violated provision.

Ohio Rev. Code § 1707.43(A). The district court determined that plaintiffs were not entitled to relief because they were the sellers in the transaction:

While neither party has addressed this issue, the Court's research indicates that Ohio's blue sky law provides a remedy only for a defrauded purchaser, not for a defrauded seller. In this case, Plaintiffs were purchasers in the first two stock purchases on January 25, 2002 and February 4, 2002. Plaintiffs were sellers in the stock for stock transaction on March 18, 2005. Accordingly, their only recourse as defrauded sellers in the March 18, 2005 transaction is their federal cause of action under 10b-5 and their state law claim for common law fraud. *See Koehler Management Corp. v. McIntyre*, 541 F.2d 611, 616 (6th Cir. 1976), *cert. denied* 429 U.S. 1074 (1977).

*Murphy v. Stargate Def. Sys. Corp.*, No. 1:05 CV 2121, slip op. at 22 n.1 (N.D. Ohio March 21, 2006).

Plaintiffs first challenged this ruling by filing a motion for a new trial. The district court denied the motion, reasoning that the purpose of the exchange was for plaintiffs to sell Spectrum, and as there were no cash purchasers available, plaintiffs settled for the only option available to

them. Plaintiffs concede that Ohio's Blue Sky Law does not protect defrauded sellers–only defrauded purchasers. *Nickels v. Koehler Mgmt. Corp.*, 541 F.2d 611, 616 (6th Cir. 1976) ("The blue sky law provides a remedy only for a defrauded purchaser, and not for a defrauded seller."). However, they argue that the deal was a trade in which both parties acted as stock purchasers.

Although defendants contend that this court should look at the intent of the parties when determining whether plaintiffs acted as sellers, Ohio's Blue Sky Law provides protection for purchasers regardless of who initiates the transaction; intent is irrelevant. *See Callahan v. Class One, Inc.*, 567 58 Ohio St. 3d 76, 576 N.E.2d 1036 (Ohio 1991) (syllabus). Ohio courts have repeatedly summarized the purpose of the Blue Sky Law in terms like these:

> The purpose of the Ohio Securities Act, generally referred to as Ohio Blue Sky Law, "is to prevent those persons willing to market worthless or unnecessarily risky securities from soliciting the purchasing public without first subjecting themselves and their securities to reasonable licensing and registration requirements designed to protect the public from its own stupidity, gullibility and avariciousness."

*Perrysburg Twp. v. Rossford,* 149 Ohio App. 3d 645, 652, 778 N.E.2d 619, 624 (Ohio Ct. App. 2002) (quoting *Bronaugh v. R. & E. Dredging Co*., 16 Ohio St. 2d 35, 40-41, 242 N.E.2d 572 (Ohio 1968)).

Under the circumstances of the exchange of stock between the parties to this action, we hold that plaintiffs should be regarded as purchasers for purposes of Ohio's Blue Sky Law. "The sale of a security . . . means among other things an exchange of securities, and as one who acquires by sale is a purchaser, so is a purchaser one who acquires by an exchange of securities." *Indem. Ins. Co. of North America v. Kircher*, 47 Ohio App. 140, 145, 191 N.E. 374, 376 (Ohio Ct. App. 1934). *See also Mader v. Armel*, 402 F.2d 158, 160 (6th Cir. 1968) (citing *Dasho v. Susquehanna Corp*., 380 F.2d 262 (7th Cir. 1967)) (holding that, in the context of a Rule 10b-5 claim, "when the merger was approved and the exchange of securities occurred, the owner of stock had in effect purchased a new security and paid for it by turning in his old one"); *Sec. Exch. Comm'n v. Nat'l Sec., Inc*., 393 U.S. 453, 467 (1967) (citing *Dasho*) (holding that, in a merger, shareholders are effectively purchasing shares in a new corporation while "losing their status as shareholders" in the previous corporation). Here, plaintiffs were using their shares of Spectrum stock to purchase shares of Stargate stock.

In approaching this issue of state law, we look to Ohio courts for guidance. Because an Ohio appellate court has decided that in a stock exchange either party can be viewed as the purchaser, *Indem. Ins. Co.*, 47 Ohio App. at 145, 191 N.E. at 376, we conclude that plaintiffs are entitled to relief as purchasers under Ohio's Blue Sky Law.

*Rescission of the January and February Stock Purchases*

The district court, finding violations of the Blue Sky Law, Ohio Rev. Code §§ 1707.44(B)(4) & (D), held that plaintiffs could rescind the 2002 stock purchases, because defendants hid Q Corp.'s insolvency and made false representations about its value, status, and performance. It also held that Murphy had an additional ground for rescinding the February transaction: defendants violated section 1707.44(C)(1) by selling an unregistered security. Defendants cross appeal these rulings.

Sections 1707.44(B)(4) and (D) prohibit a seller from making false representations in the sale of a security and from selling stock in an insolvent company without disclosing its financial

condition.**1** As mentioned above, the district court found that Woodruff made a number of misrepresentations regarding Q Corp.'s financial position. Defendants argue that the district court erred because plaintiffs could not have relied on Woodruff's misrepresentations since they were provided with the company's partial 2005 profit and loss statement, and Murphy purchased stock despite being well aware that his $20,000 loan had not been repaid.

Under Ohio's Blue Sky Law, "[r]escission is available for intentional misrepresentation without a showing of reliance . . . ." *Nickels*, 541 F.2d at 616. Regardless, the financial statement was not provided to plaintiffs until 2005, after the sale, and defendants did not default on the loan until after the purchases.

Defendants argue that Stargate was not insolvent in 2002. They maintain that its assets included a patent valued at $3,000,000 and the acquisition of Spectrum, valued at $1,000,000, for a total of $4,000,000. The value of Spectrum is irrelevant to ascertaining the solvency of Stargate at the time of the 2002 stock transactions, and the district court determined that there was no evidence that a patent was held by Stargate. It also reached the following conclusions regarding Stargate's financial picture:

> . . . Woodruff knew in February of 2002, that Q Corporation did not have a net worth of 3.5 Million dollars because he had signed three UCC financing statements on July 5, 2001 pledging as security for a loan from Carl Viviani all of the assets of Q Corp, Interwoven Electronics Corporation, and Interwoven Technologies Corporation consisting of miscellaneous office furniture and software valued at approximately $10,000. The bank accounts had nominal or negative balances. . . .

*Murphy v. Stargate Def. Sys. Corp.*, No. 1:05 CV 2121, slip op. at 6 (N.D. Ohio March 21, 2006). Moreover, Q Corp. was not repaying loans, including the $20,000 loan made by Murphy. Given these considerations, the finding by the district court, that defendants knew that Q Corp. was insolvent at the time of the 2002 stock transactions, is not clearly erroneous.

The district court found a third ground on which Murphy could rescind the February 2002 stock purchase: Woodruff acted as broker in selling an unregistered security, an act prohibited by Ohio Revised Code § 1707.44(C)(1).**2** Defendants maintain that the sale of the stock was exempt

---

**1**These provisions state in relevant part**:**

(B) No person shall knowingly make or cause to be made any false representation concerning a material and relevant fact, in any oral statement or in any prospectus, circular, description, application, or written statement, for any of the following purposes:

\*\*\*

(4) Selling any securities in this state.

Ohio Rev. Code § 1707.44(B)(4).

(D) No person who is an officer, director, or trustee of, or a dealer for, any issuer, and who knows such issuer to be insolvent in that the liabilities of the issuer exceed its assets, shall sell any securities of or for any such issuer, without disclosing the fact of the insolvency to the purchaser.

Ohio Rev. Code § 1707.44(D).

**2**This provision states in pertinent part:

(C) No person shall knowingly sell, cause to be sold, offer for sale, or cause to be offered for sale, any security which comes under any of the following descriptions:

from the registration requirements because it was a sale made by the stock issuer, in this case Stargate. *See* Ohio Rev. Code § 1707.03(O)(1)(a). The district court however, determined that Woodruff acted as a broker by selling stock held by a shareholder. As stated above, Woodruff told Murphy that he was selling him the stock at a discounted rate because the spouse of a shareholder was trying to sell it. Thus, Woodruff acted as a broker. The district court's finding was not clearly erroneous and its decision rescinding the 2002 stock purchases at issue is accordingly affirmed.

### III.

The district court's finding that plaintiffs were not stock purchasers in the March 2005 transaction is **reversed** and **remanded** for further consideration consistent with this opinion. The judgment of the district court is **affirmed** in all other respects.

---

(1) Is not exempt under section 1707.02 of the Revised Code, nor the subject matter of one of the transactions exempted in section 1707.03, 1707.04, or 1707.34 of the Revised Code, has not been registered by coordination or qualification, and is not the subject matter of a transaction that has been registered by description.

Ohio Rev. Code § 1707.44(C)(1).