William DASHO et al., Plaintiffs-Appellants,

v.

The SUSQUEHANNA CORPORATION et al., Defendants-Appellees.

No. 18572.

United States Court of Appeals, Seventh Circuit.

Jan. 18, 1972.

Rehearing Denied Feb. 25, 1972.

Certiorari Denied June 26, 1972. See 92 S.Ct. 2496, 2498.

Max E. Wildman, Adolf Loeb, Sheldon P. Migdal, Lawrence Jacobson, Chicago, Ill., for plaintiffs-appellants.

Charles S. Rhyne, Courts Oulahan, Winston M. Haythe, Rhyne & Rhyne, Washington, D. C., Milton H. Cohen, Mitchell S. Rieger, William T. Hart, Allan Horwich, Schiff Hardin Waite Dorschel & Britton, Robert O. Mansell, Quinn, Jacobs, Barry & Foster, Samuel Weisbard, Stephen C. Sandels, McDermott, Will & Emery, Robert W. Black, Chicago, Ill., for defendants-appellees.

Before FAIRCHILD, CUMMINGS and STEVENS, Circuit Judges.

STEVENS, Circuit Judge.

American Gypsum Company was merged into Susquehanna Corporation on December 13, 1965. Plaintiffs, as shareholders of Susquehanna, commenced this action in advance of the merger for the purpose of preventing its consummation and also to recover damages for Susquehanna and its pre-merger shareholders. The district court refused to enjoin the merger and dismissed Count I of the complaint which asserted claims under § 17(a) of the Securities Act of 1933 [1] and § 10 (b) of the Securities Exchange Act of 1934.[2] Proceedings under Count II, which asserted that the pre-merger proxy solicitation violated § 14(a) of the 1934 Act,[3] were apparently stayed pending the appeal to this court from the dismissal of Count I.

Count I alleged that Susquehanna had been harmed not only by the merger but also by an earlier purchase of 222,107 of its own shares at an excessive price. We held that the allegations of fraud or deception in connection with each of these securities transactions were sufficient to state a federal claim under § 17 (a) and § 10(b). Dasho v. Susquehanna Corporation, 380 F.2d 262 (7th Cir. 1967), cert. denied, Bard v. Dasho, 389 U.S. 977, 88 S.Ct. 480, 19 L.Ed.2d 470.

Following the remand, there were protracted proceedings in the district court. Count II of the complaint was reinstated, defendants answered, portions of their answers were stricken, extensive discovery was conducted, plaintiffs' request for a jury trial was denied, they amended their complaint, plaintiffs voluntarily dismissed three defendants, the court held a lengthy trial, and thereafter plaintiffs filed still another amended complaint to conform their final theories of the case to the proof. In that pleading they abandoned all charges of conspiracy.

The district court entered extensive findings of fact, conclusions of law, and judgment for the defendants on all claims. On this appeal plaintiffs contend that it was error to strike their jury demand, that the district court misconceived their theory of the case, that critical findings are clearly erroneous, and that vital evidence was improperly excluded. The threshold question is whether Ross v. Bernhard, 396 U.S. 531, 90 S.Ct. 733, 24 L.Ed.2d 729, which was decided by the Supreme Court after the trial was concluded, requires us to hold that it was error to deny plaintiffs a jury trial. Since we have concluded that it does, we must also identify the issues which should be submitted to a jury for determination when the case is remanded for a new trial.

1. 15 U.S.C. § 77q.

2. 15 U.S.C. § 78j.

3. 15 U.S.C. § 78n.

Before discussing the legal issues, we shall identify the defendants and describe the three securities transactions which gave rise to plaintiffs' derivative action.

## I.

Susquehanna is a large publicly owned corporation. In April and May of 1965 its shares were traded over the counter in the range between a low bid of 11½ and a high asked price of 14⅛. At the time of its annual meeting on April 19, 1965, approximately 2,760,000 shares were outstanding, owned by some 8,750 stockholders. At that meeting 15 directors were elected, 13 proposed by management and 2 by a group in Kansas City who had cumulated their votes to oppose the management slate. The 13 management directors, led by J. Patrick Lannan, the chairman of the board, owned or controlled about 436,000 shares; however, substantial additional amounts of Susquehanna stock were owned by friends or associates of the 13 management directors and by the Kansas City group represented by the two dissidents.

Prior to May 25, 1965, neither American Gypsum Company, over half of whose shares were controlled by defendant Herbert F. Korholz, nor Korholz himself, owned any Susquehanna stock. After consummation of the three transactions which plaintiffs challenge, Korholz had become Susquehanna's principal shareholder, and the management directors, as well as the Kansas City group, had sold a major portion of their holdings.

On May 25, 1965, Korholz purchased 430,000 shares from Lannan, certain management directors, and their friends and relatives at a price of $15 per share. On August 11, 1965, in a transaction negotiated by Korholz, Susquehanna purchased 222,107 of its own shares from the Kansas City group at a price of either $13.85 or $10.78 per share, depending on whether plaintiffs' or defendants' version of the transaction is accepted. On December 13, 1965, to consummate the merger with Gypsum, Susquehanna issued 1,274,734 shares to the former shareholders of Gypsum, including Korholz, in an exchange which was based on a determination that Susquehanna's stock had a fair value of $10.75 per share. One of the assets acquired by Susquehanna via the merger was the block of 430,000 of its own shares which Korholz had purchased from Lannan and thereafter conveyed to Gypsum; one of the liabilities was the bank indebtedness of $6,450,000 which Gypsum had incurred to finance the 430,000 share purchase.

The defendants may be identified in four groups: The Lannan defendants who sold out and resigned from the board in May or shortly thereafter;[4] the eight members of Lannan's board who remained as directors and shareholders after he sold out;[5] the two dissidents representing the Kansas City group;[6] and Korholz and his associ-

4. Lannan, Lauhoff and Wirtz resigned from the board on May 18, 1965, and sold all of their Susquehanna stock a week later. Schmick and Bard also sold all of their stock but did not resign until June 18 and July 15, respectively. Wirtz and Bard were voluntarily dismissed by plaintiffs on the first day of trial; Lannan, Lauhoff and Schmick contend that they have no responsibility for what happened after their resignations from the board.

5. Schenk, Bogan, Boshell, May, Michels, Stuart, Mason and Woolard were members of Lannan's management slate and remained on the board, and continued to own Susquehanna stock until after the merger. Mason owned only 100 shares; he was the third defendant voluntarily dismissed by plaintiffs.

6. Martin and Thomson were the two directors elected by a group of shareholders who were apparently customers of a broker in Kansas City named Coen. They had no advance knowledge or participation in the original sale of 430,000 shares to Korholz, but were familiar with the transaction with Coen in August and the merger in December.

ates.[7] Since plaintiffs' conspiracy charge has been abandoned, the different defendants obviously do not share equal responsibility for each of the three transactions which took place on May 25, August 11, and December 13, 1965. Although these transactions were not unrelated, we shall describe them separately.

1. The purchase of 430,000 shares by Korholz on May 25, 1965, was the consequence of discussions between Korholz and representatives of Lannan earlier that month. The price of $15 per share was about $3.00 over the market when it was agreed upon, subject to certain conditions. Korholz's offer was conditioned upon the resignation of five members of the Susquehanna board, including Lannan, the election of Korholz as chairman of the board of directors and as a member of the Executive Committee, and the election of two Korholz nominees (Nielsen and Hardin) to the Susquehanna board.

The offer was communicated to all 13 management directors, but not to the two dissidents or to the public. The five directors who were to resign sold their Susquehanna stock; the remaining directors made significant contributions to the 430,000 share package, either from their own holdings or from stock owned by friends and relatives,[8] but each retained an investment in Susquehanna.[9] Before they voted to elect Korholz, Nielsen, and Hardin to the Susquehanna board, the remaining directors had been advised about the business experience and integrity of the new directors and presumably also knew that the sale of

the 430,000 shares at the $15 price was contingent upon their election.

The district court found, however, that the old directors were not aware of the fact that Korholz was making the purchase on behalf of Gypsum rather than as an individual investment. He made the offer and closed the transaction in his individual capacity because Gypsum was disabled from obtaining the necessary financing without the consent of two insurance companies to which it owed several million dollars. Korholz had received informal assurance that such consents would be forthcoming and, therefore, had been able to borrow $6,450,000 from The First National Bank of Boston on the understanding that Gypsum would assume that indebtedness and acquire the 430,000 shares of Susquehanna as soon as conditions specified by the insurance companies had been met. Those conditions included the election of Korholz as chairman and two of his designees as members of Susquehanna's board of directors, and an assurance from Gypsum that if it were merged into Susquehanna, the merged company would promptly repay the bank loan of $6,450,000.

It is apparent that Korholz, Gypsum, and The First National Bank of Boston were conscious of the fact that Susquehanna's current assets exceeded its total liabilities by over $13,000,000 when the funds to finance the 430,000 share purchase were advanced. The management directors of Susquehanna apparently knew little more than that Korholz, a capable and imaginative executive, was prepared to pay a premium price of $15

---

7. Korholz is the principal defendant. Hardin, Nielsen and Reeves were his nominees to replace the members of the Lannan management who resigned on May 18, 1965, or shortly thereafter. Gypsum, the corporation of which Mr. and Mrs. Korholz owned or controlled 57% before its merger into Susquehanna, is also a defendant.

8. Thus, for example, Bogan, who owned or controlled 56,152 shares at the time of the annual meeting in April, delivered about 65,000 shares into the package and still

retained 13,986 shares on September 15, 1965, according to the proxy statement. Woolard, who retained his own holding of 16,800 shares, sold approximately 70,000 shares for his associates.

9. Seven of the remaining directors owned a significant number of shares after the Korholz purchase, ranging, at the time the proxy statement for the merger was prepared, from 64,229 for Michels and 47,260 for May, to 2,147 for Schenk, the company president.

per share for about 15% of Susquehanna's stock and to accept a position of major responsibility in the direction of the corporation's affairs.

Precisely what public announcement of the transaction was made is not clear from the record. The district court found that "when the information as to facts was publicly released promptly after the May 18 board meeting, there was no effect whatsoever on the price of Susquehanna in the over-the-counter market."

The first transaction resulted in a significant change in the ownership of Susquehanna's stock and in the composition of its management, but it had no direct impact on the corporation's assets, liabilities, or capital structure. The balance sheet of Gypsum, however, was materially affected as soon as the arrangements to finance the purchase price had been concluded. It acquired a $6,450,000 asset, consisting of the block of 430,000 shares of Susquehanna, and a new liability of an equivalent amount, represented by the bank loan. Gypsum retained this asset and this liability until it was merged into Susquehanna in December.

2. In the second transaction which was closed on August 11, 1965, Susquehanna acquired 222,107 of its own shares and $300,685 in cash in exchange for 140,000 shares of the stock of Vanadium Corporation of America which Susquehanna had owned for four or five years. The transaction was closed through an escrow at The First National Bank of Boston in which three parties, Susquehanna, M. Coen, representing the Kansas City group, and Vanadium, all made deposits and withdrawals.

Vanadium deposited $3,377,500 in cash and withdrew 140,000 of its own shares; [10] Coen, on behalf of the Kansas City group, deposited 222,107 shares of Susquehanna stock and made a net cash withdrawal of $3,076,815; Susquehanna deposited the 140,000 shares of Vanadium and withdrew the 222,107 shares of Susquehanna deposited by the Kansas City group and the cash balance of $300,-685.

Three versions of this transaction have been put forward by the parties, one by the plaintiffs and two by the defendants.

Plaintiffs contend that Vanadium's payment of $3,377,500 established the value of the block of 140,000 of its shares, and that a simple calculation of the Susquehanna and Coen deposits and withdrawals reveals a purchase by Susquehanna of a block of its own shares for a price of $13.85, or a premium of about $3 over the market.[11]

Defendants contend that Susquehanna simply exchanged its block of Vanadium stock for 222,107 Susquehanna shares owned by the Kansas City group, and that the resale of the Vanadium stock for cash was a separate transaction to which Susquehanna was not a party. On the day before the exchange agreement was executed, the mean price for Susquehanna in the over-the-counter market was almost $11, and Vanadium closed at $19.25; the exchange agreement was predicated on a trade of 140,000 shares of Vanadium at $19.25 each (a total package of $2,695,000) for 250,000 shares of Susquehanna at $10.78 each, with a pro rata cash adjustment to be made if a lesser quantity of Susquehanna shares should be delivered.[12] Thus, under defendants' first version of the transaction, it was simply an exchange of shares on a market-to-market basis, without any premium attached to either

10. It promptly sent a letter to its shareholders reporting that it had made a favorable purchase of those shares at a price of $24.125 per share, a price which, though over the current market, was less than book value.

11. The net amount received by the Kansas City group ($3,076,815) divided by the number of Susquehanna shares delivered (222,107) equals a price of $13.85.

12. Thus, the difference between the maximum purchase of 250,000 shares and the 222,107 shares actually delivered accounts for the cash distribution to Susquehanna of $300,685.

block. In essence, this is the version of the transaction which was reported to Susquehanna's shareholders in the pre-merger proxy statement. Consistently with this interpretation, no disclosure was made of the resale of the Vanadium shares at a price of $24.125, which netted the Kansas City group a premium of $682,500. Defendants contended that such a premium could not have been realized in any sale by Susquehanna because an outstanding injunction prohibited Susquehanna from voting those shares.[13]

Plaintiffs offered evidence to prove that defendants knew, or should have known, that a premium was obtainable for the block of 140,000 shares of Vanadium, and that the premium value had been deliberately made available to the Kansas City group to forestall threatened litigation and possible opposition to a merger with Gypsum.[14]

Defendant's second version of the transaction was that the directors, acting in good faith and exercising an informed, independent business judgment, might deliberately make a premium available to the Kansas City group in order to eliminate the divisive influence on the board represented by the two dissident directors, thereby permitting Susquehanna to function more effectively and harmoniously. The two dissidents remained on the board and thereafter voted consistently with their colleagues. In substance, defendants' second interpretation of the August transaction is that if Susquehanna did, indeed, pay a premium price for the 222,107 shares purchased from the Kansas City group, a corporate benefit of equivalent value was received, or at least the directors in good faith so believed. Under this version it is not entirely clear to us whether defendants are contending that the "informed business judgment" of the directors included knowledge that a premium was being made available to the Kansas City group.

The district court entered findings proposed by defendants which appear to accept both of defendants' versions of this transaction.

3. In the merger consummated on December 13, 1965, Susquehanna in effect "sold" 1,274,734 newly issued shares to the Gypsum shareholders in exchange for the assets and liabilities of Gypsum. One new share of Susquehanna was issued in exchange for each 1.9 shares of Gypsum. This exchange ratio was determined by New York Hanseatic Corporation and reviewed by Stone and Webster, both being recognized as experts in such matters, and both expressing the opinion that an exchange ratio of 1.9 to 1 was fair to both groups of shareholders.

In calculating the exchange ratio, the experts ignored Susquehanna's earnings, having determined that its "break up" value exceeded its worth as a going concern. They concluded that the total market value of its net assets [15] was approximately $27,135,000, which was equal to $10.75 for each share outstanding. Thus, in effect, the price of the Susquehanna shares "sold" via the merger was $10.75.

13. See Vanadium Corp. of America v. Susquehanna Corp., 203 F.Supp. 686, 697 (D.Del.1962).

14. Coen, representing the Kansas City group, addressed a letter to the Susquehanna directors threatening to commence litigation to recover the premium portion of the price received by Lannan and the other selling parties in May and to enjoin Korholz and his associates from acting as directors and from voting any of the shares purchased from Lannan. Korholz thereafter proposed the exchange of Vanadium stock for the stock represented by Coen. After the exchange was authorized by the Susquehanna board on July 15, 1965, Korholz introduced Coen to the Vanadium principals with whom he negotiated the resale. He formally withdrew his threat of litigation by letter of August 10.

15. They treated a federal income tax loss carryover as an "asset" with a value of about $2,900,000. The gross amount of the carryover was reported in the proxy statement at $14,400,000 as of December 31, 1964.

In calculating the value of Gypsum's contribution to the merged enterprise, the experts capitalized its earnings. As reported in the proxy statement, Gypsum's earnings for the years 1961 through 1965 had been 4, 5, 41, 45 and 33 cents per share respectively. The experts' calculation was not, however, based on the reported earnings. They determined that the elimination of non-recurring losses and the addition of projected profits warranted an upward adjustment in the earnings for the year ended June 30, 1965, to 56½ cents per share. They then applied a capitalization rate of 10% and concluded that the Gypsum shares were worth $5.65 each.[16] The relationship between $5.65 per share of Gypsum and $10.75 per share of Susquehanna produced the 1.9 to 1 exchange ratio.

In their report the experts also prepared a schedule showing the relationship between the market prices of Susquehanna and Gypsum for each month between January, 1964, and July, 1965. During most of those months a ratio based on comparative market values would have been more favorable to Gypsum,[17] but in the first four months of 1965 it would have been somewhat more favorable to Susquehanna, ranging between 1.92 to 1 and 2.02 to 1 during those months.

The experts took note of the fact that one of Gypsum's major assets was its ownership of 430,000 shares of Susquehanna stock. Those shares were carried on Gypsum's books at their cost of $6,450,000 (or $15 per share). With its investment in Susquehanna valued at cost, Gypsum's stock had a book value of $2.20 per share, as reported in the proxy statement. Since, however, the experts had appraised Susquehanna stock as worth only $10.75 per share (as compared with the $15 cost on Gypsum's books), they recognized that the value of Gypsum's ownership of 430,000 Susquehanna shares should be reduced by $1,827,500 (430,000 times $4.25 per share), and that such an adjustment would reduce the Gypsum stockholders' equity to about $3,984,000,[18] or approximately $1.53 per share. This adjustment, as well as Gypsum's heavy indebtedness, was a factor considered by New York Hanseatic in determining the 10% capitalization rate for Gypsum. It noted that Gypsum stock had been valued in the market "historically" at 13 to 18 times earnings, and, therefore, the multiple of 10 was considered appropriate.[19]

The two companies distributed a joint proxy statement, as well as a series of supplementary letters, in which they reported that the directors of both companies unanimously favored the merger. In essence, Susquehanna was contributing a strong balance sheet and a large tax loss, and Gypsum was contributing earnings potential, to a mutually beneficial combination. The proxy statement reported the conclusions of New York Hanseatic and Stone and Webster, but omitted any explanation of the basis of the experts' evaluations.

Plaintiffs contend that the proxy statement omitted, or inaccurately stated, a number of material facts. They criticized the descriptions of the original Korholz purchase, of the purchase from

16. Gypsum's "adjusted earnings for the 12 months ended June 30, 1965" as determined by the experts were $1,374,000. (PX 72, p. 8) Applying the capitalization rate of 10%, they thus assumed that the value of Gypsum's contribution to the merged enterprise was approximately $13,740,000 as compared with their appraisal of Susquehanna's "break up" value at approximately $27,135,000.

17. Thus, for example, in January of 1964 the ratio would have been 1.15 to 1, and in July of 1965, 1.62 to 1.

18. The experts' opinion does not give complete details on how this figure was arrived at, but we accept it as accurate enough for our purposes.

19. They made no comment on the fact that the conservative multiple of 10 times the adjusted earnings of 56½ cents produced a higher value than a liberal multiple of 17 times the audited earnings of 33 cents per share.

the Kansas City group, and of the extent of Korholz's control over the management of the company and the planning of the merger.

The merger was approved by the shareholders of both companies; 97% of the shares of Gypsum were voted affirmatively in favor of the merger and 75% of the shares of Susquehanna. Thus, over 200,000 votes more than the required 66⅔% of the Susquehanna votes needed for approval were obtained. Approximately 25% of the shares either did not vote or voted against the merger.

## II.

Defendants contend that plaintiffs were not entitled to a jury trial because (a) Ross v. Bernhard, 396 U.S. 531, 90 S.Ct. 733, 24 L.Ed.2d 729, which was decided on February 2, 1970, announced a new rule of constitutional law that is inapplicable to the trial in this case which was concluded on October 22, 1969; (b) plaintiffs' jury demand was not timely; and (c) in any event it related to only three of the 18 defendants. We have concluded that none of these arguments is supportable.

## A.

To support their contention that Ross v. Bernhard does not apply retroactively, defendants rely on DeStefano v. Woods, 392 U.S. 631, 88 S.Ct. 2093, 20 L.Ed.2d 1308. In that case the Supreme Court held that the decisions in Duncan v. Louisiana, 391 U.S. 145, 194, 88 S.Ct. 1444, 20 L.Ed.2d 491 and Bloom v. Illinois, 391 U.S. 194, 88 S.Ct. 1477, 20 L.Ed. 2d 522, would not be applied retroactively. In *Duncan* and *Bloom,* the Court had upheld a defendant's right to a jury trial in serious criminal cases, including criminal contempts. The argument here is that if the constitutional right to a jury trial is not enforced retroactively in cases involving personal liberty, *a fortiori,* there should be no retroactivity

in litigation involving mere property rights.

The argument implies that nonretroactivity should have broader application in civil than in criminal litigation. In fact, however, "the nonretroactive application of judicial decisions has been most conspicuously considered in the area of criminal process." Chevron Oil Co. v. Huson, 404 U.S. 97, 105–106, 92 S.Ct. 349, 355, 30 L.Ed.2d 296 (1971). There is almost no suggestion in any of the cases from Linkletter v. Walker, 381 U.S. 618, 85 S.Ct. 1731, 14 L.Ed.2d 601 through Mackey v. United States, 401 U.S. 667, 91 S.Ct. 1160, 28 L.Ed.2d 404 (see especially Mr. Justice Harlan's concurring opinion, 675–702, 90 S.Ct. 1160) that this line of authority should be applied to civil litigation. Nevertheless, there are instances in which the "doctrine of nonretroactivity" has been applied in civil litigation. Chevron Oil Co. v. Huson, *supra,* 404 U.S. at 106, 91 S.Ct. 349.

In dealing with the nonretroactivity question, the Supreme Court has generally considered three separate factors. The first, which we consider decisive here, is whether the rule sought to be applied establishes "a new principle of law, either by overruling clear past precedent on which litigants may have relied . . . or by deciding an issue of first impression whose resolution was not clearly foreshadowed." Ibid. In this case defendants' argument assumes that Ross v. Bernhard announced a new rule of procedure because there was no preexisting right to a jury trial in derivative litigation. This position was persuasively advanced by the majority of the Second Circuit in the opinion on which the court below relied,[20] and by Mr. Justice Stewart in his dissent in *Ross,* 396 U.S. 531, 543–551, 90 S.Ct. 733, 24 L.Ed.2d 729. We think it plain, however, that we must follow the rationale of the Supreme Court's majority opinion which merely held, in agreement with a 1963 decision of the Ninth

---

20. Ross v. Bernhard, 403 F.2d 900 (2nd Cir. 1968), but see Smith, C. J., dissenting at p. 915.

Circuit,[21] that "the Seventh Amendment preserves to the parties in a stockholder's suit the same right to a jury trial that historically belonged to the corporation and to those against whom the corporation pressed its legal claims." 396 U.S. at 542, 90 S.Ct. at 740. Under the analysis made in the Supreme Court's majority opinion, *Ross* did not establish a new principle of law. It merely resolved a conflict in the circuits consistently with the Court's interpretation of prior law.

The second factor in deciding the retroactivity question is whether, weighing the merits and demerits in each case, retrospective application will further or retard operation of the rule. The third requirement is that we weigh the possible inequities of retroactive application. Since there were conflicting rules in the circuits, the defendants knew that the issue was not settled and that the district court might be reversed on appeal. They were certainly aware of the Ninth Circuit's decision in the *DePinto* case, as well as the fact that a member of the Second Circuit panel in Ross v. Bernhard had filed a dissenting opinion. It is, therefore, no more inequitable here than in any other case presenting an unsettled question of law to require defendants, who could have avoided the issue by consenting to a jury trial, to bear the risk of reversal on appeal. Moreover, our appraisal of the disclosures pertaining to the exchange of 140,000 shares of Vanadium Corporation stock for 222,107 shares of Susquehanna persuades us that it would not be inequitable to retry this case. Finally, we fail to see how retroactive application will retard operation of the rule. Thus, though we consider the first criterion decisive,

we have also considered and rejected any claim of nonretroactivity based on the second and third criteria.

The basic reason for holding that a new rule will not be applied retroactively is to avoid unfairness to parties who may have acted in reliance on the old rule.[22] In this case, however, defendants do not seek to justify any aspect of their conduct of the three transactions challenged by plaintiffs by claiming reliance on a rule which antedated the Supreme Court decision in Ross v. Bernhard. Nothing more than trial tactics was involved in their motion to strike the plaintiffs' jury demand. This is not one of the exceptional situations in which a holding of nonretroactivity is required to avoid consequences akin to the enactment of an ex post facto law.

We hold that plaintiffs were entitled to demand a jury trial of any legal claims historically triable to a jury which they have asserted against defendants on behalf of Susquehanna Corporation.

### B.

Defendants contend that plaintiffs' jury demand was not timely. It was filed more than 38 months after the original complaint and several months after all defendants had answered. It was incorporated in a reply which itself was not filed within the time specified by the court.

Defendants rely on cases holding that after the right to a jury trial has been waived, the right cannot be revived by a belated amendment to the pleadings which does not raise any new issues.[23] However, a review of the proceedings in this case persuades us that there was no point in time when it could fairly be said

21. DePinto v. Provident Security Life Ins. Co., 323 F.2d 826, cert. denied 376 U.S. 950, 84 S.Ct. 969, 11 L.Ed.2d 970.

22. See Schaefer, The Control of "Sunbursts": Techniques of Prospective Overruling, 42 N.Y.U.L.R. 631 (1967); Fairchild, Limitation of New Judge Made Law to Prospective Effect Only: "Prospective Overruling" or Sunbursting, 51 Marquette L.R. 254, 257 (1967–68).

23. See Moore v. United States, 196 F. 2d 906, 908 (5th Cir. 1952); Connecticut General Life Ins. Co. v. Breslin, 332 F.2d 928, 931 (5th Cir. 1964); Leighton v. New York Susquehanna & Western R.R., 36 F.R.D. 248, 249 (S.D.N.Y. 1964).

that plaintiffs had waived their right to demand a jury.

Rule 38(b) permits a party to postpone decision on whether or not to demand a trial by jury until after the issues to be submitted to the jury have been finally framed by the pleadings.[24] Presumably, that is the reason the timeliness of a jury demand is measured from the filing of the "last pleading directed to such issue," and also why amendments which do not really change the issues do not revive a right that has been waived.

■ In this case plaintiffs cannot be charged with sole responsibility for the time which elapsed before the case was finally at issue. The sufficiency of Count I of the complaint was tested by motions to dismiss which led to the first appeal to this court. After the remand, defendants filed their answers in February and March of 1968. Plaintiffs promptly moved to strike several portions of the answers, including parts of all five affirmative defenses asserted by defendants Korholz, Gypsum and Susquehanna. Those motions raised substantial questions which were briefed at length and led to the entry of an order on October 21, 1968, in which the court struck portions of the affirmative defenses and granted plaintiffs leave to file a reply by December 1, 1968. The reply was not actually filed until December 30, 1968, but no objection to its filing was made at that time.

If the reply had been filed on December 1, 1968, quite clearly it would have been the "last pleading" within the meaning of Rule 38(b). Up to that time there had been no final definition of the issues and no waiver of the right to a jury trial. By permitting the reply to be filed on December 30, 1968, the trial court effectively extended the time for filing the "last pleading," and thus the time in which to demand a jury.

When the district court sustained the motion to strike the jury demand, he placed no reliance on its late filing. Commendably he made it perfectly clear that his ruling was based on the Second Circuit decision in Ross v. Bernhard, and he indicated at the hearing on the motion that if the law permitted a jury trial in a derivative action, he would not have rejected the demand as untimely. We hold that plaintiffs did not waive their right to a jury trial.

### C.

■ The pleading which included the jury demand was identified as a reply to the affirmative defenses of only three of the defendants. It is, therefore, contended that the demand should be construed as limited to the issues raised in the affirmative defenses of those three defendants.

Even as so construed, however, it is clear that basic issues in the litigation were encompassed by the reply and, therefore, by the jury demand incorporated therein. The affirmative defenses squarely raised the question whether Susquehanna had been damaged by any of the alleged misconduct of the defendants, the question whether the merger exchange ratio was fair, and other important issues.

The broad language of the jury demand plainly indicated that plaintiffs wanted a jury trial of all issues which could properly be submitted to a jury. Defendants other than Korholz, Gypsum and Susquehanna construed the demand as applicable to them because they also filed a motion to strike. The trial judge viewed the problem as whether any jury trial was appropriate in a derivative action, and does not appear to have considered the possibility of separating out certain issues for the jury. We have no doubt that if the trial judge had had the benefit of the later Supreme Court opin-

---

24. Rule 38(b) provides:

"(b) Demand. Any party may demand a trial by jury of any issue triable of right by a jury by serving upon the other parties a demand therefor in writ-ing at any time after the commencement of the action and not later than 10 days after the service of the last pleading directed to such issue. Such demand may be indorsed upon a pleading of the party."

ion in Ross v. Bernhard, he would not have construed the demand in the restrictive manner which defendants urge here. Assuming that the demand was timely, as we have held, we think a fair construction of its broad language would cover all issues that plaintiffs are entitled to have tried by a jury. We, therefore, must identify those issues.

### III.

Although the holding in Ross v. Bernhard makes it plain that plaintiffs, who are suing derivatively on behalf of Susquehenna, have "the same right to a jury trial that historically belonged to the corporation," 396 U.S. at 542, 90 S.Ct. at 740, 24 L.Ed.2d 729, in that case the Supreme 'Jourt was not required to define the scope of that right. The opinion recognizes the possibility that some breaches of fiduciary duty by corporate directors may not be triable to a jury;[25] the reference to history in the statement of the holding implies that claims which are traditionally regarded as equitable in character may properly be heard by the court.

It is important to state the claims asserted by plaintiffs as precisely as possible, not only because we must differentiate between legal and equitable claims, but also because the relevant law is still in an embryonic stage of development and the Supreme Court has admonished us not to stunt its growth with "glib generalizations and unthinking abstractions."[26] We shall, therefore, first con-sider the two claims which we held sufficient on the prior appeal and then turn our attention to the several other claims which are included in the complaint as finally amended.

For purposes of identification we shall refer to the two principal claims as Susquehanna's (a) "purchase" and (b) "sale" of its own shares. The "purchase" was the acquisition of 222,107 shares from the Kansas City group in exchange for the block of Vanadium stock, and the "sale" was the issuance of 1,274,734 new shares to the former Gypsum shareholders at the time of the merger.

Also for identification purposes, we may list the additional claims which merit discussion as (1) the claim that the Lannan defendants received a premium for selling control of Susquehanna to Korholz; (2) a claim that § 10(b) and Rule 10b–5 were violated by failure to disclose the contemplated transfer of control before it took place; (3) a claim that the Lannan directors did not adequately investigate the qualifications of Korholz to be an officer and director of Susquehanna before his election; (4) a claim that the court should appoint a disinterested arbiter to redetermine the merger exchange ratio; and (5) a claim that deficiencies in the premerger proxy statement require that the merger be set aside.

We turn to the two claims for damages.

---

25. "In the instant case we have no doubt that the corporation's claim is, at least in part, a legal one. The relief sought is money damages. There are allegations in the complaint of a breach of fiduciary duty, but there are also allegations of ordinary breach of contract and gross negligence. The corporation, had it sued on its own behalf, would have been entitled to a jury's determination, at a minimum, of its damages against its broker under the brokerage contract and of its rights against its own directors because of their negligence. Under these circumstances it is unnecessary to decide whether the corporation's other claims are also properly triable to a jury. Dairy Queen, Inc. v. Wood, 369 U.S. 469 [82 S.Ct. 894, 8 L.Ed.2d 44] (1962)." 396 U.S. at 542–543, 90 S.Ct. at 740.

26. "Although § 10(b) and Rule 10b–5 may well be the most litigated provisions in the federal securities laws, this is the first time this Court has found it necessary to interpret them. We enter this virgin territory cautiously. The questions presented are narrow ones. They arise in an area where glib generalizations and unthinking abstrations are major occupational hazards. Accordingly, in deciding this particular case, remembering what is not involved is as important as determining what is." SEC v. National Securities, Inc., 393 U.S. 453, 465, 89 S.Ct. 564, 571, 21 L.Ed.2d 668.

A. *Susquehanna's "purchase" of its own stock.*

██ Federal jurisdiction was properly invoked in this case because the complaint alleged violations of three federal statutes.[27] Of these three, it is § 10(b) of the Securities Exchange Act of 1934, and more particularly Rule 10b–5, that has most direct relevance to the claim that Susquehanna was damaged by paying too much in connection with the purchase of its own shares from members of the Kansas City group in August of 1965. The Rule plainly affords protection to both sellers and purchasers.[28] A private party injured by a violation of the Rule may either rescind his purchase or sale or recover his damages in an action at law.[29] It seems clear that a jury trial is appropriate in such a damage action.[30]

██ In this case there is no doubt that Susquehanna's acquisition of its own shares in exchange for its block of Vanadium stock was a "purchase" within the meaning of the Rule. Plaintiffs contend that as a direct consequence of fraud or deceit proscribed by the Rule, the purchase was made at a price which was unfair to Susquehanna.[31]

The perpetrators of the alleged fraud included several of the directors of Susquehanna. Since the challenged transaction did not require shareholder approval, the directors would normally speak for the corporation in connection with the matter. To the extent that the directors were competent to act for the corporation, it therefore would follow that Susquehanna was the victim of its own fraud.

This theoretical dilemma has been met in other cases by recognizing that defendant directors may deceive disinterested members of the board, and through them the corporation.[32] Plaintiffs relied on that theory in the presentation of their evidence and in their argument

27. See footnotes 1, 2 and 3, *supra.*

28. Supt. of Ins., State of New York v. Bankers Life & Cas. Co., 404 U.S. 6, 92 S.Ct. 165, 30 L.Ed.2d 128 (1971) ; Birnbaum v. Newport Steel Corp., 193 F.2d 461, 463 (2nd Cir. 1952). Rule 10b–5 provides :

"It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,

"(a) To employ any device, scheme, or artifice to defraud,

"(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

"(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security."

17 CFR § 240.10b–5 (1971).

29. The Supreme Court has clearly indicated that its holding in J. I. Case Co. v. Borak, 377 U.S. 426, 84 S.Ct. 1555, 12 L.Ed.2d 423, encompasses an action for damages. See Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics, 403 U.S. 388, 397, 91 S.Ct. 1999, 29 L.Ed.2d 619. Note also the comment by Mr. Justice Harlan in his concurring opinion at p. 402, 91 S.Ct. at p. 2008 : "Thus, in suits for damages based on violations of federal statutes lacking any express authorization of a damage remedy, this Court has authorized such relief where, in its view, damages are necessary to effectuate the congressional policy underpinning the substantive provisions of the statute. J. I. Case Co. v. Borak, 377 U.S. 426 [84 S.Ct. 1555, 12 L.Ed.2d 423] (1964) ; . . . ."

30. See, *e. g.,* Myzel v. Fields, 386 F.2d 718, 740–741 (8th Cir. 1967), cert. denied, 390 U.S. 951, 88 S.Ct. 1043, 19 L.Ed.2d 1143 ; Esplin v. Hirschi, 402 F.2d 94, 95 (10th Cir. 1968), cert. denied, 394 U.S. 928, 89 S.Ct. 1194, 22 L.Ed.2d 459. See also Dairy Queen, Inc. v. Wood, 369 U.S. 469, 477–479, 82 S.Ct. 894, 8 L.Ed.2d 44.

31. The price paid for the Susquehanna shares may, of course, properly be measured by the value of the consideration delivered to the seller by the purchaser. See Mueller v. Korholz, 449 F.2d 82, 86, 88 (7th Cir. 1971).

32. Ruckle v. Roto American Corp., 339 F.2d 24 (2nd Cir. 1964). See also Supt. of Ins. of State of New York v. Bankers Life & Cas. Co., 404 U.S. 6, 92 S.Ct. 165, 30 L.Ed.2d 128 (1971).

here. However, a different theory is embodied in the complaint.

■ The complaint alleges that the entire board was interested in the transaction and, therefore, was not competent to authorize the purchase by the corporation. Accordingly, it is contended that defendants were under a duty to make full disclosure of their adverse personal interests to the shareholders, and that the failure to make that disclosure, or to advise the shareholders that the exchange actually cost Susquehanna $682,500, constituted a fraud or deceit prohibited by Rule 10b–5. The sufficiency of that claim is established as the law of this case, see 380 F.2d 262 at 269–270, and we are satisfied that insofar as a damage recovery is sought, the allegations raise issues triable to a jury.

It does not necessarily follow that the case should be remanded for a new trial on those issues. For if the evidence which plaintiffs adduced at the trial before the court was not sufficient to prove a *prima facie* case, the denial of a jury trial was harmless error. We shall, therefore, consider whether the record contains evidence tending to prove that Susquehanna was deceived, that there was a causal connection between the deception and the purchase, and that it was damaged thereby.

Although the trial judge, after weighing the evidence, rejected the inferences which plaintiffs draw from the facts, we cannot say that either of defendants' versions of the transaction is so clearly correct that plaintiffs' proof failed as a matter of law. Defendants contend that the block of Vanadium stock had no greater value to Susquehanna than the current market because the shares could not be voted while owned by Susquehanna and that, in any event, the benefits received by Susquehanna from the set-

tlement of the pending litigation with Vanadium and the elimination of potential dissension within Susquehanna's top management more than offset the premium value of the Vanadium stock (and thus the true over-the-market cost of the purchased Susquehanna shares). If either of these factual propositions is correct, the purchase did not injure Susquehanna and the damage action must fail. But there is certainly evidence in the record from which a jury could conclude that Susquehanna could have realized a premium—possibly the full $682,500 [33]—on a sale of the Vanadium stock to a third party or to Vanadium itself, and further, that making peace with the Kansas City group did not necessarily produce a corporate benefit of comparable value. The evidence on the damage issue is, therefore, sufficient for submission to a jury.

There is also evidence tending to prove that material facts were not disclosed to Susquehanna (either to the shareholders or to all of the directors voting on the matter), and that the purchase might not have been consummated on the same terms if full disclosure had been made.

If plaintiffs' version of the transaction is correct, the purchase resulted in a net injury to Susquehanna of approximately $682,500. Neither this fact nor the fact that a threat of litigation was avoided by making the exchange was ever disclosed to the shareholders. Such nondisclosure would not violate Rule 10b–5, however, if a disinterested majority of the board of directors was fully informed about all relevant facts, and if in the good faith exercise of their business judgment they concluded that the transaction was in the best interests of the corporation.[34] For on that hypothesis, since a disinterested majority of the board would have the authority to consummate the transaction, the disclosures

---

33. The actual damages need not be the full $682,500. If Susquehanna itself could have sold only for a lesser premium, that lesser premium would be the measure of damages. Or, if the jury valued the benefits received as greater than the market value of the Susquehanna shares but

less than the full value of the Vanadium shares sold, the difference would be the damage recoverable.

34. Kors v. Carey, 39 Del.Ch. 47, 158 A.2d 136, 139, 141 (Del.1960) ; Warshaw v. Calhoun, 221 A.2d 487 (Del.1966).

within the board would constitute disclosure to the corporation.

A violation of Rule 10b–5 did result, however, if either of two factual propositions is established by the evidence. First, if material facts were misrepresented or withheld from some members of the board of directors, the corporation was deceived. Ruckle v. Roto American Corporation, 339 F.2d 24 (2nd Cir. 1964). Second, if the entire board of directors was interested in the transaction, a duty of disclosure to the shareholders existed,[35] and the corporation was deceived by the nondisclosure. Although it is not entirely clear that the second proposition has enough evidentiary support to justify submission to a jury,[36] there is substantial evidence in the record tending to prove that there was inadequate disclosure, and possibly actual misrepresentation, of material facts within the board of directors.[37] The evidence of fraud or

35. See 380 F.2d at 270.

36. Most of the directors apparently owed no special allegiance to Korholz. There appear to be three aspects of the "interest" of such directors in the transaction involving Vanadium stock: (1) to remove possible opposition to the Gypsum merger; (2) to eliminate dissension within the board; and (3) to avoid Coen's threatened litigation. The first two aspects of their interest would not conflict with their status as shareholders or directors. The third aspect might, however, if the evidence indicated that the director was a potential defendant in the threatened litigation and that it was reasonable to infer that the threat was of sufficient importance to influence his action as a director. The marginal character of the exposure of certain directors, when compared with the substantial character of their interest as shareholders in the welfare of the corporation (Michels, for example, owned over 64,000 shares), makes it extremely doubtful that their independence was compromised by the threat contained in Coen's letter of June 17, 1965, which can be read as not contemplating any claim at all against some members of the board. However, since plaintiffs will have the right to offer additional evidence at the retrial, and since we may have overlooked evidence which the trial judge might consider significant, we do not squarely decide the issue. We believe it is probably in the area in which we would respect the trial judge's discretion, whichever way he ruled, because of his superior ability to evaluate the evidence as it is actually presented.

37. For example, the minutes of the July 15, 1965, meeting of the Susquehanna board of directors contains the following:

"It was further reported to the Board that efforts had been made by Susquehanna without success to sell its Vanadium shares for a price in excess of market. Those shares were recently offered by Mr. Korholz and Mr. William L. Brown of The First National Bank of Boston to International Mining Corporation, as well as to Vanadium on that basis, but both such corporations had rejected the offer.

"Mr. Korholz then reported that with the consent of the Executive Committee he had discussed with Mr. M. J. Coen of Kansas City, a possible exchange of the Vanadium shares for 250,000 shares of Susquehanna said to be owned by Mr. Coen and customers or his associates. Such discussion had resolved itself into a possible exchange on the basis of market values since Mr. Coen refused to pay a substantial premium for the Vanadium shares unless a comparable premium was paid for his block of Susquehanna shares." PX 1–R, pp. 5–6.

If this were all that was disclosed, and if Korholz had been aware of the possibility of Vanadium Corporation itself buying the stock at a premium, the jury could certainly conclude that he withheld such information from other members of the board in order to arrange the premium for Coen and persuade Coen to withdraw threatened litigation. There was also testimony that Korholz had previously called Coen and asked him "whether he wanted to make some money on his investment or whether he just wanted to raise hell." (Tr. 447) And further, "[F]irst of all, get rid of this letter [threatening litigation] and then I will do it, we can work quietly on some program that gets you what you want as long as it is within reason and gets me what I want for the company." (Tr. 451) Following the July 15 meeting, Korholz accompanied Coen to New York and introduced him to Harder, a Vanadium director and a vice president of International Mining Co. which held substantial Vanadium stock. The purpose of the introduction was to help Coen sell the 140,000 shares. (Tr. 524–525) This evidence may not prove

deception was thus sufficient to raise an issue for the jury.

Finally, we are persuaded that if the jury should accept plaintiffs' appraisal of the true impact of the transaction on Susquehanna, and if it should conclude that some of the directors were misled by Korholz, it would also be entitled to find a causal connection between the fraud and the injury. We, therefore, hold that plaintiffs are entitled to have a jury decide the issues raised by their claim that the purchase of 222,107 of its shares from the Kansas City group in July of 1965 resulted in damage, possibly as much as $682,500, to Susquehanna.

B. *Susquehanna's "sale" of its own shares.*

From Susquehanna's point of view, the statutory merger involved a sale of 1,274,734 of its own shares, and a purchase of 2,421,996 shares of Gypsum. SEC v. National Securities, Inc., 393 U.S. 453, 467–468, 89 S.Ct. 564, 21 L.Ed.2d 668; Dasho v. Susquehanna Corp., 380 F.2d 262, at 268–269, cert. denied, 389 U.S. 977, 88 S.Ct. 480, 19 L.Ed.2d 470; Swanson v. American Consumer Industries, Inc., 415 F.2d 1326, 1330 (7th Cir. 1969). Since interstate facilities were employed to consummate the exchange, the merger was a "securities transaction" covered by Rule 10b–5.

If it was the product of fraud or deception proscribed by the Rule, and if Susquehanna thereby suffered a pecuniary injury, a cause of action for damages may be prosecuted by plaintiffs on behalf of the corporation. Under Ross v. Bernhard, we believe such a claim would be triable to a jury. Before analyzing other elements of the claim, it is appropriate to consider the damage issue; unless the record contains evidence on which an award of damages could be based, a jury trial may be unnecessary and our review may be limited to determining whether the district court find-

ings on the issue of liability are clearly erroneous.

We find nothing in the record to suggest that Susquehanna should not have been merged with a profitable corporation in order to take full advantage of its tax loss. Nor do we find any evidence indicating that Gypsum was not an appropriate component of such a merged enterprise, or that a more favorable opportunity was lost because of the Gypsum merger. Thus, neither the fact that the merger took place, nor the fact that it was Gypsum that was merged into Susquehanna, appears to have caused any injury to Susquehanna.

Nevertheless, it is possible that the terms of the merger may have damaged Susquehanna. Even if it was wise to sell its shares to obtain Gypsum's earnings, Susquehanna may have been fraudulently induced to accept an inadequate price per share and therefore to issue too many shares.

For purposes of analysis we may assume that Susquehanna sold its own shares for a price of $10.75 per share and purchased Gypsum shares for a price of $5.65 per share. If either the former price was too low, or the latter price was too high, and if no compensating adjustment in the other is appropriate, Susquehanna was damaged. In other words, if the exchange ratio was unfair to Susquehanna, it was injured by the merger.

The district court found that the exchange ratio was fair. All the directors so testified, and plaintiffs offered no expert testimony to the contrary. The finding is further supported by the opinions of New York Hanseatic Corporation and Stone and Webster. Even though the finding is not clearly erroneous, indeed even if we would enter the same finding ourselves, it does not follow that the record contains no evidence from which a jury might have come to a different conclusion.

wrongdoing on the part of Korholz, but, taken with other evidence, could provide a basis for a jury to conclude that Kor-

holz had deceived other members of the board.

If the jury could properly find that Susquehanna's approval of the terms of the merger was obtained by fraud, and that a full disclosure of all material facts would have required an adjustment of those terms in order to obtain the necessary authorization to consummate the transaction, the conclusion that the corporation was in fact damaged by the fraud would be supportable. Assuming the existence of a violation and consequent injury, the question would then be whether the record contains any evidentiary basis for a reasonable calculation of the amount of that pecuniary injury.

Of course, damages may not be the product of pure conjecture or speculation. See Bigelow v. RKO Radio Pictures, 327 U.S. 251, 264, 66 S.Ct. 574, 90 L.Ed. 652. A jury cannot be permitted to make a random selection of any exchange ratio that might appeal to it. But if we assume that all other elements of the claim, except the amount of damages, have been adequately established, the same standards that juries employ to determine comparable issues in other complex commercial litigation would permit recovery here if the evidence provides a reasonable basis for measuring the injury. On that assumption, we have concluded that the record does contain evidence from which a jury could select an acceptable measure of damages.

It is not inconceivable that arm's length bargaining between fully informed representatives of Gypsum and Susquehanna would have produced an exchange ratio predicated on comparative market values during the months immediately preceding Gypsum's $6,450,000 investment in Susquehanna.[38] For each of the four months prior to May of 1965 such an approach would have produced a more favorable ratio for Susquehanna than 1.9 to 1. Viewing the transaction broadly, if, for example, the ratio of 2.02 to 1 or 1.96 to 1 had been used instead of 1.9 to 1, it could not be said that the total price paid by Susquehanna to acquire Gypsum's assets and earnings was beyond a tolerable range of fairness.[39] For on a 2 to 1 basis, assuming with the experts that Susquehanna's shares were worth only $10.75 apiece, it would have paid an aggregate price of approximately $13,000,000 [40] for earnings of $814,000, as audited (or $1,374,000, as adjusted) and net assets of $3,984,000.[41]

We by no means suggest that this is the proper measure of damages in this case. Nor do we imply that market values are a better determinant of exchange ratios than expert appraisals. We merely hold that they provide a permissible measure from which a jury may estimate the amount of pecuniary damages which a defrauded party has suffered. We, therefore, conclude that if the record contains evidence tending to prove the other elements of plaintiffs' cause of action predicated on the merger, the claim for damages may be submitted to a jury. We now consider those other elements.

Plaintiffs must, of course, prove a violation of law by the defendants and a

38. Following that investment, the value of Gypsum, relative to the value of Susquehanna, improved. If there was any causal connection between the investment and that relative change, it would suggest that Susquehanna, rather than Gypsum, was undervalued. For this purpose we assume that May should be considered the month in which Gypsum made its investment since Korholz was acting in its behalf.

39. Thus, if such a "fair" ratio, rather than the actual ratio, also "fair" in abstract terms, would have been the ratio chosen by arm's length bargaining of fully informed parties, then such other ratio might be relevant in the computation of damages.

40. If Gypsum's 2,421,996 shares had been acquired on a 2 for 1 basis, Susquehanna would have issued 1,210,998 shares. At the price of $10.75 per share, the aggregate issue would have been worth $13,018,228.50. At the same price, the number actually issued on the 1.9 to 1 basis (1,274,734) was worth approximately $685,000 more.

41. The figure of stockholder's equity used in New York Hanseatic report.

causal connection between the violation and an injury to Susquehanna. Plaintiffs have argued that there were several deficiencies in the proxy solicitation which violated SEC Rule 14a–9, implementing § 14(a) of the 1934 Act, and that the causation issue is settled by *Mills v. Electric Auto-Lite*, 396 U.S. 375, 90 S.Ct. 616, 24 L.Ed.2d 593. We are convinced that at least one of their attacks on the proxy statement raises a triable issue of fact, but we are not sure that *Mills* disposes of the causation issue in an action for damages. We first consider the violation.

The relevant language of Rule 14a–9 is similar to that found in Rule 10b–5 [42] and § 29(a). The proxy solicitation was unlawful if it contained "any statement which . . . is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading. . . ." If a jury should agree with plaintiffs' version of the transaction in August 1965 (when Susquehanna used its block of Vanadium stock to purchase 222,107 of its own shares), it could also properly conclude that the description of that transaction in the proxy statement was misleading.[43] If plaintiffs' analysis is correct, the proxy statement falsely advised the shareholders that a purchase by Susquehanna of approximately $3,000,000 worth of its own shares had been made on a "market to market" basis when in fact a premium of $682,500, amounting to about $3 per share, was paid. The magnitude of the transaction, the fact that it related directly to the value of Susquehanna shares (and therefore to the fairness of the bargain which was the subject of the proxy statement), and the character of the omission or misstatement, all satisfy the test of materiality as stated by the Second Circuit in General Time Corporation v. Talley Industries, Inc.[44] To the extent that intent is relevant, the evidence is adequate.[45] Plainly, then, there was sufficient evidence of a violation to be submitted to a jury.

---

42. Both Rule 10b–5 and Rule 14a–9 apply to proxy solicitations in connection with a purchase or sale of a security. See SEC v. National Securities, Inc., 393 U.S. 453, 468, 89 S.Ct. 564, 21 L.Ed.2d 668; Swanson v. American .Consumer Industries, Inc., 415 F.2d 1326, 1331 (7th Cir. 1969).

43. Indeed, even if it should accept defendants' second version of the transaction and determine that the directors' "informed business judgment" included knowledge that a substantial premium was being made available to the Kansas City group, the proxy statement would be misleading because that information was not disclosed to the shareholders.

44. "The test, we suppose, is whether, taking a properly realistic view, there is a substantial likelihood that the misstatement or omission may have led a stockholder to grant a proxy to the solicitor or to withhold one from the other side, whereas in the absence of this he would have taken a contrary course." 403 F.2d 159 at 162 (1968), cert. denied, 393 U.S. 1026, 89 S.Ct. 631, 21 L.Ed.2d 570. Since plaintiffs circulated a letter to the Susquehanna shareholders urging them to vote against the merger, we believe the comparative approach suggested by the Second Circuit as appropriate for proxy contests is also appropriate here.

45. The "scienter" required in common law fraud is not necessary.

"[K]nowledge of the falsity or misleading character of a statement and a bad faith intent to mislead or misrepresent are not required to prove a violation of the statute upon which a civil remedy for damages will lie." Kohler v. Kohler Co., 319 F.2d 634, 637 (7th Cir. 1963).

See also S.E.C. v. Texas Gulf Sulphur Co., 401 F.2d 833, 854–855 (2d Cir. 1968), cert. denied, Coates v. Securities and Exchange Commission, 394 U.S. 976, 89 S.Ct. 1454, 22 L.Ed.2d 756, in which the court indicates that "lack of diligence, constructive fraud, or unreasonable or negligent conduct" may meet the state of mind requirement. *Id.* at 855. These cases discussed the required mental state in a 10(b)–5 case. The same requirements apply in a 14(a) proxy statement case. See Butler Aviation Intern'l, Inc. v. Comprehensive Designers, Inc., 307 F.Supp. 910, 914 (D.C.N.Y.1969), aff'd, 425 F.2d 842 (2d Cir. 1970); Gerstle v. Gamble-Skogmo, Inc., 298 F.

On the question of causation, there is no doubt that the proxy solicitation was an essential link in the accomplishment of the merger. Apart from the solicitation, there is no contention that defendants could have mustered the necessary two-thirds vote required for the approval of the merger. The following language in the *Mills* opinion may, therefore, determine the causation issue:

"Where the misstatement or omission in a proxy statement has been shown to be 'material,' as it was found to be here, that determination itself indubitably embodies a conclusion that the defect was of such a character that it might have been considered important by a reasonable shareholder who was in the process of deciding how to vote. This requirement that the defect have a significant *propensity* to affect the voting process is found in the express terms of Rule 14a–9, and it adequately serves the purpose of ensuring that a cause of action cannot be established by proof of a defect so trivial, or so unrelated to the transaction for which approval is sought, that correction of the defect or imposition of liability would not further the interests protected by § 14(a).

"There is no need to supplement this requirement, as did the Court of Appeals, with a requirement of proof of whether the defect actually had a decisive effect on the voting. Where there has been a finding of materiality, a shareholder has made a sufficient showing of causal relationship between the violation and the injury for which he seeks redress if, as here, he proves that the proxy solicitation itself, rather than the particular defect in the solicitation materials, was an essential link in the accomplishment of the transaction." 396 U.S. at 384–385, 90 S.Ct. at 621.

There are two reasons why quotation of that language out of its context does not necessarily eliminate the causation issue in this case. In *Mills* the plaintiffs were seeking equitable relief, not damages as plaintiffs do here. In *Mills*, apart from any question of the fairness of the exchange ratio, plaintiffs sought to vindicate their right to be shareholders of a separate company rather than a larger, combined enterprise [46]; here the merger itself was apparently unobjectionable [47] and a damage award must, in effect, depend on a revision of the exchange ratio. Thus, although the *Mills* holding would seem to require a finding of "legal injury" caused by the violation, in this case that injury may not include any pecuniary loss.[48]

Supp. 66, 97 (D.C.N.Y.1969) (even less "scienter" than required in a Rule 10(b)– 5 case is required in a § 14(a) case).

We feel it unnecessary to discuss the evidence in this case on the requisite mental state except to say that the evidence appears sufficient to warrant a jury finding that the requisite mental state existed. We note, of course, that if plaintiffs prevail on the intracorporate deception theory, then there may be some defendants who did not have the requisite state of mind.

46. See the portion of footnote 5 appearing on page 383 of 396 U.S., 90 S.Ct. 616.

47. In the letter which plaintiffs mailed to the Susquehanna stockholders urging a vote against the merger, they stated, in part:

"We take no position here as to whether a merger between Susquehanna and American Gypsum is desirable. We do, however, take the position that based upon the information presently available to stockholders, the terms proposed seem grossly unfair to Susquehanna. *We, therefore, urge that you do not approve the merger on its present terms.*" (Emphasis in original.) DX– 68, p. 3.

48. We identified two different kinds of legal injury in *Swanson, supra*:

"Defendants next assert that no injury can be shown because any corporate opportunities or going concern value of which the Peoria shareholders might have been deprived is retained by them by virtue of their continuing equity position in ACI. The short answer is that if the allegations of the complaint are proved, the Peoria shareholders were entitled to a more favor-

In short, we think *Mills* takes us this far: If plaintiffs prevail on the issue of materiality, they have also established that approval of the 1.9 to 1 exchange ratio was unlawfully obtained. But that approval caused Susquehanna monetary injury only if (a) Susquehanna would have been better off with no merger at all; or (b) a more favorable exchange ratio would have been available if there had been full disclosure. The first alternative is not supported by any evidence which has been called to our attention; the second requires an evaluation of the transaction from Gypsum's point of view as well as Susquehanna's. For if it were plain from the record that Gypsum's shareholders would not in any event have approved a merger on terms which required surrender of more than 1.9 of their shares for each Susquehanna share, then approval of those terms, even if unlawfully obtained, did not harm Susquehanna.

Plaintiffs argue that Gypsum was under significant economic pressure to effect the merger because of its heavy indebtedness and its commitment to repay the $6,450,000 bank loan promptly after the completion of the merger. They contend, therefore, that arm's length bargaining would have produced a more favorable ratio for Susquehanna without precluding the likelihood that Gypsum's shareholders would have approved of the merger on different terms. The district court found this argument unpersuasive, but we cannot say that it is so lacking in evidentiary support that it does not warrant consideration by the trier of fact.

Accordingly, we conclude that there is evidence in the record from which a jury might find (1) that material facts were misstated or omitted from the proxy materials in violation of federal law; (2) that the violation caus-

ed the shareholders of Susquehanna to approve the merger on the terms submitted; (3) that terms which would have been more favorable to Susquehanna might have been sufficiently attractive to the Gypsum shareholders to make it reasonable to conclude that they would have given their approval to different terms; and (4) that the record contains relevant data from which a jury might make a just and reasonable estimate of the amount of Susquehanna's damage. We, therefore, hold that plaintiffs are entitled to have a jury decide the issues raised in their claim for damages predicated on the merger.

### IV.

In our opinion, plaintiffs' remaining claims are all equitable in character. Two relate to the merger and three to Korholz's original purchase in May.

With respect to the merger, plaintiffs prayed that it either be set aside or that an independent arbiter be appointed to redetermine the exchange ratio. The record makes it quite clear that neither of these forms of relief would be feasible or appropriate. The merger itself (as opposed to its terms) does not appear to have harmed Susquehanna or its shareholders, and it is far too late to permit an arbiter to remake the bargain which the minority shareholders of Gypsum accepted.

With respect to the sale of 430,000 shares to Korholz, plaintiffs advance three theories of recovery, each of which is predicated on a version of the transaction which the district court rejected. Plaintiffs argue that certain findings with respect to the alleged transfer of control from Lannan and his associates to Korholz are clearly erroneous, or at least could be shown to be erroneous if admissible evidence had not been improperly excluded. For purposes of consid-

able exchange ratio than they were granted and may have had their equity position unfairly diluted. Moreover, as recognized by the Supreme Court in SEC v. National Securities, Inc., 393 U.S. 453, 467, 89 S.Ct. 564, 21 L.Ed.

2d 668, the fraudulent substitution of shareholder status in one company for the same status in another may constitute a cognizable legal injury in and of itself." 415 F.2d at 1332.

ering these claims, we assume, without deciding, that the evidence should have been received and that plaintiffs' version of the transaction is essentially correct.

They contend that Korholz's payment of $6,450,000 was not merely a purchase of shares but included the payment of a premium of about $1,075,000 to obtain working control of Susquehanna. He would not have paid that price unless he had been sure of adequate representation on the board, including election as its chairman. After his election, his position, coupled with his stock ownership, enabled him to exercise "working control" of the corporation. Assuming these facts as proved, we consider plaintiffs' three theories of recovery.

A. First, relying on SEC v. Texas Gulf Sulphur Co., 401 F.2d 833 (2nd Cir. 1968), cert. denied, Coates v. Securities and Exchange Commission, 394 U.S. 976, 89 S.Ct. 1454, 22 L.Ed.2d 756, plaintiffs contend that Rule 10b–5 was violated when the Lannan directors sold their shares on the basis of "material inside information" which they possessed and which they had a duty to disclose to the public. The inside information was the fact that Korholz had offered to pay them $15 per share for a block of 430,000 shares.

We would agree that if the directors, having knowledge of such an offer, had purchased shares at a lower price on the open market in order to assemble a block to be sold to Korholz at the premium price, those purchases on the open market would be securities transactions covered by Rule 10b–5. We find no evidence of any such purchases; nor is there any evidence that the plaintiffs, or any member of the class they represent, engaged in any purchase or sale of Susquehanna stock which would have been more favorable if the Korholz offer had been disclosed before his purchase from Lannan was consummated, or that anyone failed to engage in any favorable transaction as a result of the nondisclosure.

We do not believe Rule 10b–5 imposes an obligation on controlling shareholders to make prompt disclosure of every offer they receive[49], and find no evidence that an earlier disclosure of the Korholz offer would have benefitted plaintiffs in any way. We, therefore, conclude that the district court correctly rejected plaintiffs' first contention.

B. Plaintiffs also contend that the Lannan directors did not make an adequate investigation of Korholz before electing him to the board. They argue that a full investigation would have revealed that he was purchasing the stock on behalf of Gypsum, that he was already planning a merger, and that as a consequence of the merger Susquehanna would provide the funds which were used to pay $6,450,000 to the Lannan group.

49. "An insider's duty to disclose information or his duty to abstain from dealing in his company's securities arises only in 'those situations which are essentially extraordinary in nature and which are reasonably certain to have a substantial effect on the market price of the security if [the extraordinary situation is] disclosed.' Fleischer, Securities Trading and Corporate Information Practices: The Implications of the Texas Gulf Sulphur Proceeding, 51 Va.L.Rev. 1271, 1289." SEC v. Texas Gulf Sulphur Co., 401 F.2d 833, 848 (2nd Cir. 1968), cert. denied, Coates v. Securities and Exchange Commission, 394 U.S. 976, 89 S.Ct. 1454, 22 L.Ed.2d 756.

"The essence of the Rule is that anyone who, trading for his own account in the securities of a corporation has 'access, directly or indirectly, to *information intended to be available only for a corporate purpose* and not for the personal benefit of anyone' may not take 'advantage of such information knowing it is unavailable to those with whom he is dealing,' *i. e.*, the investing public. Matter of Cady, Roberts & Co., 40 S.E.C. 907, 912 (1961)" *Id.* (emphasis added.)

The information which some of the directors had—that Korholz was willing to pay $15 a share for 430,000 shares of Susquehanna stock—was not "information intended to be available only for a corporate purpose."

To the extent that this argument is advanced to support the prayer that Korholz's election as a director should be declared null and void, it is foreclosed by findings of fact to the effect that adequate investigation of his character, reputation, and experience was made. Those findings are supported by the record.

To the extent that the argument relates to the consequences of the merger, we believe it is subsumed by plaintiffs' second damage claim. If neither the merger itself nor its terms damaged Susquehanna, the fact that assets of the merged enterprise were used to discharge a liability of the merged enterprise certainly did not damage either of its components.

 C. Finally, in their reply brief plaintiffs have directed our attention to Keely v. Black, 90 N.J.Eq. 439, 107 A. 825 (N.J.Ch.1919), and certain other state cases to support the suggestion that the premium received by a director in connection with the sale of a controlling block of stock should be treated as an asset of the corporation. The rule of that case is not a matter of federal law or, so far as we have been advised, the law of the state in which either Susquehanna or Gypsum was incorporated. Even if Lannan's shares constituted control of Susquehanna, we believe he had a right to sell them for a premium price. See Essex Universal Corp. v. Yates, 305 F.2d 572 (2nd Cir. 1962).

 Defendants Lannan, Lauhoff and Schmick are not responsible for actions taken by other defendants or by the board of directors after their respective resignations. The death of defendant Michels has been suggested of record. Accordingly, insofar as the district court judgment dismissed the claims against Lannan, Lauhoff, Schmick and Michels, it is affirmed. As to the other defendants, the judgment is reversed and the case is remanded for a jury trial.